IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-02194-KLM

MARK JANNY,

      Plaintiff,

v.

TIM PALMER, Captain, Larimer County Jail, in his individual capacity,
MR. RAMIREZ, Lieutenant, Larimer County Jail, in his individual capacity,
JOSH BELINDER, Lieutenant, Larimer County Jail, in his individual capacity,
MR. BERGLUND, Sergeant, Larimer County Jail, in his individual capacity,
MS. PALORANTA, Sergeant, Larimer County Jail, in her individual capacity,
MR. HARTEKER, Sergeant, Larimer County Jail, in his individual capacity,
MR. SMOYER, Sergeant, Larimer County Jail, in his individual capacity,
MR. SAULTS, Sergeant, Larimer County Jail, in his individual capacity,
MR. LALICKER, Sergeant, Larimer County Jail, in his individual capacity,
MR. PERANTEAUX, Sergeant, Larimer County Jail, in his individual capacity,
MR. MEEKS, Corporal, Larimer County Jail, in his individual capacity,
MR. BURCH, Corporal, Larimer County Jail, in his individual capacity,
MS. WULFERT, Corporal, Larimer County Jail, in his individual capacity,
MR. VILLARREAL, Corporal, Larimer County Jail, in his individual capacity,
MS. MAHONEY, Corporal, Larimer County Jail, in her individual capacity,
MR. BROWN, Corporal (logistics), Larimer County Jail, in his individual capacity,
MS. GEE, Deputy, Larimer County Jail, in her individual capacity,
JUSTIN SMITH, Larimer County Sheriff, in his individual and official capacity,
ATTORNEY DOE, Larimer County Attorney Office, in their individual capacity,
THE MUNICIPALITY OF LARIMER COUNTY,
LARIMER COUNTY DEPUTIES 1-100, in their individual capacities, and
JAIL SUPERVISORS 1-20, in their individual capacities,

      Defendants.

_____

## ORDER
_____

## ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX

This matter is before the Court on Defendants' **Motion for Summary Judgment**

[#144][1] (the "Motion").[2]  Plaintiff, who is proceeding pro se,[3] filed a Response [#152] to the

Motion, and Defendants filed a Reply [#155].  The Court has reviewed the briefs, the entire

case file, and the applicable law, and is sufficiently advised in the premises. For the

reasons set forth below, the Motion [#144] is **GRANTED in part and DENIED in part**.

## I.  Summary of the Case[4]

The majority of evidence underlying Plaintiff's ten remaining claims is discussed in

connection with each claim in the Analysis below, and the Court here only addresses a few

general points underlying the case.  Plaintiff is an inmate currently incarcerated by the

Colorado Department of Corrections ("CDOC") at Colorado State Penitentiary ("CSP").

However, at all times relevant to this lawsuit, he was held at the Larimer County Jail

("LCJ"), first as a pretrial detainee starting on February 8, 2016, and then as a convicted

---

[1]  "[#144]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF).  This convention is used throughout this Order.

[2]  The parties have consented to proceed before the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 40.1(c).  *See Order* [#133].

[3]  The Court must construe liberally the filings of pro se litigants. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, the Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf.*"* *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must follow the same procedural rules that govern other litigants. *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

[4]  The Court construes the evidence in a light most favorable to Plaintiff as the nonmovant here. *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant."). To the extent facts are explicitly undisputed by the parties, the Court cites to the briefs. The Court also notes here that, pursuant to 28 U.S.C. § 1746, Plaintiff swore to his Amended Complaint [#46] under penalty of perjury, and therefore this document may be treated as an affidavit and used as evidence on a motion for summary judgment.  *Green v. Branson*, 108 F.3d 1296, 1301 n.1 (10th Cir. 1997); *Pacheco v. Timme*, No. 11-cv-02530-RM-KLM, 2014 WL 2442111, at *4 n.2 (D. Colo. May 30, 2014).

prisoner starting on July 27, 2017, through the time of his transfer to another facility on September 20, 2017.

Plaintiff was arrested and briefly detained at the LCJ in early October 2015 for a parole violation. *Motion* [#144] at 8; *Response* [#152] at 3. Plaintiff was again arrested and booked into the LCJ on February 8, 2016, on two outstanding felony warrants for aggravated robbery. *Motion* [#144] at 7-8; *Response* [#152] at 3. Plaintiff was convicted by a jury on July 27, 2017, sentenced on September 18, 2017, and transferred to a CDOC facility on September 20, 2017. *Motion* [#144] at 7-8; *Response* [#152] at 3; *see also Defs.' Ex. A* [#144-1]. Plaintiff submitted roughly 200-300 grievances and appeals during his stay at the LCJ between February 8, 2016, and September 20, 2017. *Motion* [#144] at 12; *Response* [#152] at 7.

Ten claims remain in this lawsuit.[5] However, the precise legal basis for each of these claims is often unclear and/or asserted under a variety of constitutional amendments, including the First, Fourth, Fifth, Eighth, and Fourteenth Amendments, and/or state laws. Further, it is often unclear against which of the many named Defendants a given aspect of a claim is asserted. This issue is compounded by the fact, as further discussed below, that Plaintiff appears to have abandoned certain aspects of certain claims without explicitly saying so. Regardless, the Court has done its utmost to determine which aspects of Plaintiff's Amended Complaint [#46] remain at issue at this stage of the lawsuit based on a liberal reading of Plaintiff's Response [#152, #152-1] in conjunction with Defendants' understanding of the remaining claims and the Court's own reading of the Amended

---

[5] Claims Five and Seven were dismissed on October 11, 2019. *See Minute Order* [#151].

Complaint [#46].

As relief, Plaintiff seeks nominal, compensatory, and punitive damages as well as declaratory relief and various injunctions against the Municipality of Larimer County (or, alternatively, Defendant Justin Smith in his official capacity as Larimer County Sheriff) to direct the LCJ to take, or refrain from taking, various actions. *Am. Compl.* [#46] at 111-13. In the present Motion [#144], Defendants seek dismissal and/or summary judgment in their favor on all claims.

## II.  Standard of Review

### A.      Fed. R. Civ. P. 12(b)(1)

Subject  matter jurisdiction may be challenged by a party or raised sua sponte by the court at any point in the proceeding. *See, e.g.*, *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6, 16-19, (1951); *Harris v. Illinois–California Express, Inc.*, 687 F.2d 1361, 1366 (10th Cir. 1982); Fed. R. Civ. P. 12(h)(3).  Rule 12(b)(1) concerns whether the Court has jurisdiction to properly hear the case before it.  Dismissal of a federal claim for lack of subject-matter jurisdiction "is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)).  Because "federal courts are courts of limited jurisdiction," the Court must have a statutory basis to exercise its jurisdiction.  *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); see Fed. R. Civ. P. 12(b)(1).  Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed.  *F. & S. Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction."

*Id.* (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

**B.      Fed. R. Civ. P. 56**

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Under Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most

favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 (4th ed. 2017).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works, Inc., v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

Only documents that meet the evidentiary requirements of Fed. R. Civ. P. 56 may be considered for purposes of summary judgment. Rule 56(c) provides that:

> (1) A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials[.]
. . .
(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c)(1)-(4).

## III.  Analysis

### A.  Fed. R. Civ. P. 12(b)(1): Subject Matter Jurisdiction

#### 1.  Declaratory Relief

The Court must sua sponte consider the question of subject matter jurisdiction when it comes to the Court's attention that the Court may lack jurisdiction over a matter. *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1252 (10th Cir. 1988); *Smith v. Krieger*, 643 F. Supp. 2d 1274, 1293 n.6 (D. Colo. 2009).   Accordingly, the Court first considers whether it has subject matter jurisdiction over Plaintiff's request for declaratory relief.  *See Herrara v. Alliant Specialty Ins. Servs., Inc.*, No. 11-00050-REB-CBS, 2012 WL 959405, at *3 (D. Colo. Mar. 21, 2012) (stating that issues of subject matter jurisdiction "must be resolved before the court may address other issues presented in the motion").

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, "validly confer[s] jurisdiction on federal courts to issue declaratory judgments in appropriate cases." *Calderon v. Ashmus*, 523 U.S. 740, 745 (1998).  The DJA explicitly incorporates the case or controversy requirement of the Constitution by stating: "In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. §

2201(a). The Court therefore considers the issue of jurisdiction pursuant to Rule 12(b)(1) with respect to Plaintiff's request for declaratory judgment. *See, e.g.*, *Van Deelen v. Fairchild*, No. 05-2017, 2005 WL 3263885, at *7 (D. Kan. Dec. 1, 2005).

"Where a plaintiff seeks both an injunction and declaratory relief, the district court has a duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of an injunction." *Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) (internal quotations omitted) (quoting *Super Tire Eng'g Co. v. McCorckle*, 416 U.S. 115, 121 (1974)). "It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Id.* (citations omitted). In other words, "where a plaintiff seeks a declaratory judgment against his opponent, he must assert a claim for relief that, if granted, would affect the behavior of the particular parties listed in his complaint." *Id.*

To establish that a case or controversy exists, Plaintiff must demonstrate that the controversy is: (1) definite, concrete, and touches on the legal relations of the parties, and (2) sufficiently immediate and real. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937); *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). In short, "[t]he ultimate question is whether declaratory relief will have some effect in the real world." *Van Deelen*, 2005 WL 3263885, at *7 (citing *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)). The mere fact that Plaintiff's requested relief would give Plaintiff the satisfaction that he was wronged in the past does not create an actual, live controversy. *Id.* (citing *Bauchman v. West High Sch.*, 132 F.3d

542, 548-49 (10th Cir. 1997) (holding that the case or controversy requirement was not met because the plaintiff's requested declaratory relief was moot)). Further, "[e]ven if subject matter jurisdiction exists, the Court has unique and substantial discretion to determine the propriety of declaratory judgment[.]" *Id.* (citing *Exec. Risk Indem. Inc. v. Sprint Corp.*, 282 F. Supp. 2d 1196, 1202 (D. Kan. 2003)).

Plaintiff seeks a declaratory judgment holding that "the acts and omissions described herein violated [Plaintiff's] rights under the constitution and laws of the United States." *Am. Compl.* [#46] at 111. Thus, Plaintiff seeks a declaration that his constitutional rights were violated by Defendants. If the Court were to grant his request, the declaratory judgment would not "affect[ ] the behavior of [D]efendant[s] toward [P]laintiff," because Defendants would not be required to take any action. *See Rhodes v. Stewart*, 488 U.S. 1, 4 (1988). In other words, Plaintiff is seeking a retrospective opinion that Defendants wrongly harmed him, which is an impermissible use of a declaratory judgment. *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (holding that a claim for declaratory relief was moot where the "primary claim of a present interest in the controversy is that [the plaintiff] will obtain emotional satisfaction from [the] ruling"); *Green v. Branson*, 108 F.3d 1296, 1299 (10th Cir. 1997) ("This 'legal interest' must be more than simply the satisfaction of a declaration that a person was wronged."). Thus, the Court finds that there is no case or controversy with regard to Plaintiff's requested declaratory relief regarding past alleged wrongs.

Accordingly, Plaintiff's request for declaratory relief is **dismissed without prejudice** for lack of subject matter jurisdiction. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216-17 (10th Cir. 2006) (recognizing established rule that "where the district court dismisses for lack of jurisdiction . . . , the dismissal must be without prejudice" because a

court without jurisdiction lacks power "to make any determination of the merits of the underlying claim").

### 2.    Injunctive Relief

Plaintiff seeks extensive injunctive relief in connection with LCJ's practices and policies.  *Am. Compl.* [#46] at 111-13.   Specifically, he asks for "[a] preliminary and permanent injunction ordering the municipality of Larimer County to order the Larimer County Jail" and/or its employees:

> (1) to allow inmates the minimum procedural due process . . . when being placed on administrative segregation or red tag status.  Also to replace the ad seg behavioral mark level up system with one that will not allow deputies to arbitrarily and subjectively stop inmates from progressing on ad seg. Something as easy as to not be found guilty of any disciplinary write ups in a week to level up.  Also change the policy of not allowing inmates on ad seg to progress if they have demanded a due process hearing for ad seg or punitive seg.  The hearings before were held during the same shift as the alleged behavior violation.  Also before every red tag review confront an inmate with any report that may be used against them and give them a chance to make a statement on their behalf;
>
> (2) to allow inmates with [Alternative Defense Counsel ("ADC")] lawyers to call their attorneys for free like an inmate with a public defender can.  The ADC lawyers are registered with the court as are their work phone numbers;
>
> (3) [to] overhaul the legal resource policies to ensure effectiveness, adequacy, and availability to fulfill the requirements of *Bounds v. Smith*, 430 U.S. 817 (1977).   Specifically the jail needs . . . more legal kiosks or computers to access LEXIS (the current system they employ) and "pro se computer" in every housing area . . . .  The jail needs to "hire" inmate clerks to assist inmates who are ignorant or illiterate but would like to access the courts.  The jail needs to allow inmates to create and print legal documents and to make legal copies despite whether an inmate is indigent or not.  The jail must adjust the price of copies from 50 cents a page to 15 cents a page. The jail must provide a way to save documents they are creating electronically.   The jail must allow inmates to assist each other when accessing the courts;
>
> (4) to allow inmates to assist each other in preparing legal work including having legal papers of another inmates [sic] in an inmates [sic] cell;

(5) to not use K-9 units in cell extractions or to physical[ly] hurt or threaten inmates in any way.  The only reason K-9 units may only be used in the jail is to utilize the K-9 units [sic] sense of smell to search for contraband (drugs, electronic devices, explosives, etc.);

(6) to never enact a punishment or behavior plan that violates an inmates [sic] constitutional rights;

(7) to train, educate and test all of its employees in regard to inmate constitutional civil rights;

(8) [to] allow inmates to wear socks or be barefoot while exercising in the outdoor rec area or provide safe footwear to run in;

(9) to stop retaliation in any form including special "facility need" housing assignments for accessing the courts, utilizing the grievance system, and assisting other inmates [to] do the same;

(10) to allow inmates the minimum procedural due process . . . for disciplinary violations that can be punished with lockdown or can affect an inmates [sic] inmate worker status and thus good time (all disciplinary violations); and

(11) to not put [Plaintiff] on red tag, ad seg or any other punitive status if and when [he] return[s] to the jail upon any future appellate decision based on events covered in this lawsuit.  This injunction would not cover actions in my future that would place me on red tag or ad seg.

*Id.*

Mootness is an issue of subject matter jurisdiction, which can be raised at any stage of the proceedings.  *Kennedy v. Lubar*, 273 F.3d 1293, 1301-02 (10th Cir. 2001).  "Article III's requirement that federal courts adjudicate only cases and controversies necessitates that courts decline to exercise jurisdiction where the award of any requested relief would be moot—i.e. where the controversy is no longer live and ongoing." *Front Range Equine Rescue v. Vilsack*, 782 F.3d 565, 568 (10th Cir. 2015) (internal quotation marks omitted). "A case is moot . . . where the relief sought can no longer be given or is no longer needed."

*Id.* (internal quotation marks omitted).

Plaintiff's requests for injunctive relief are moot because Plaintiff has moved from LCJ to a different facility, i.e., CSP, a state prison operated by CDOC. *See Notices* [#11, #43, #104]. "When a prisoner files suit against prison officials who work in the institution in which he is incarcerated, seeking declaratory and injunctive relief on the basis of alleged wrongful conduct by those officials, and then that prisoner is subsequently transferred to another prison or released from the prison system, courts are presented with a question of possible mootness." *Jordan*, 654 F.3d at 1027. When a prisoner's claims relate solely to the conditions of confinement at the penal institution at which the prisoner was previously incarcerated, courts are unable to provide the prisoner with effective relief, because the transfer or release indicates the end of the alleged deprivation. *Id.* Here, Plaintiff only requests injunctive relief from his original place of incarceration, and there is no indication that the conditions at his current penal institution are depriving him of the rights for which he seeks injunctive relief in his Amended Complaint [#46].

In addition, the Court notes that LCJ, the facility at issue in this lawsuit, is not a facility operated by CDOC, which operates Plaintiff's current facility, CSP. Courts are disinclined to declare a prisoner's injunctive claims moot if the lawsuit challenges policies in place throughout a prison system, even when a prisoner is transferred to another prison in that system. *Jordan*, 654 F.3d at 1028. Here, however, LCJ is not a prison within the CDOC system, and therefore, the policies have not followed Plaintiff to CSP.

Having found that Plaintiff's request for injunctive relief is moot, the Court next examines whether any exception to the mootness doctrine applies. Plaintiff responds to Defendants' mootness argument by asserting that he could be transferred back to LCJ at

any time if his various appeals and other lawsuits are resolved in his favor.  *Response* [#152-1] at 22-24.  Thus, he places the second exception to the mootness doctrine at issue, i.e., that the wrongs he has alleged are capable of repetition yet evading review.  Plaintiff bears the burden of establishing the applicability of this exception.  *Jordan*, 654 F.3d at 1035.  As discussed below, the Court finds that Plaintiff does not present a reasonable likelihood that he will be returned to LCJ.

The "capable of repetition yet evading review" exception to the mootness doctrine turns on whether Plaintiff has established a demonstrated probability that he will be reassigned to LCJ in the future, and thereby will again be subjected to the restrictions at issue in this case.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again . . . ."); *Underwood v. United States*, 255 F. App'x 337, 338 (10th Cir. 2007) ("[P]laintiff must do more than speculate about future possibilities.  [Plaintiff] must show a 'reasonable expectation' or a 'demonstrated probability' that this same controversy . . . will recur." (internal quotations and citation omitted)).

Here, Plaintiff contends that he may be reassigned to LCJ if he is successful in his various pending lawsuits and appeals. *Response* [#152-1] at 22-24.  However, the Court concludes that Plaintiff has not demonstrated with any specificity or immediacy that he will be returned to LCJ.  Like the Tenth Circuit's determination in *Jordan v. Sosa*, Plaintiff "offers [the Court] nothing to validate the reasonableness of his expectancy of changed conditions of penal confinement."  654 F.3d at 1036.  Issuing a decision as to the restrictions imposed at LCJ, especially regarding this Plaintiff who is no longer held at LCJ

and based on a mere possibility that he will both be successful in his lawsuit(s) *and* returned to LCJ, would constitute rendering an impermissible advisory opinion. *See Deberry v. Davis*, 460 F. App'x 796, 799 (10th Cir. 2012). In other words, Plaintiff has not established a demonstrable *probability* that he will be reassigned to LCJ at some point in the future. *See id.* Therefore, the Court finds that the exception to the mootness doctrine for situations that are capable of repetition yet evade review is inapplicable to the instant case. *See McKinnon v. Talladega County, Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984) (holding that a prisoner's transfer to a different jail moots his claim for declaratory and injunctive relief even when prisoner argues that "there is no assurance that he will not be returned to the [first] jail").

The Court's conclusion is consistent with *Jordan*, where the Tenth Circuit evaluated an incarcerated plaintiff's challenge to "the constitutionality of a statutory and regulatory ban on the use of federal funds to distribute to federal prisoners commercially published materials that are sexually explicit or feature nudity." 654 F.3d at 1015. After resolution of the matter by the district court, the plaintiff was transferred from a more restrictive federal facility to other federal Bureau of Prisons facilities. *Id.* at 1018. Thus, on appeal, the Tenth Circuit was compelled to address whether any part of the case was mooted by the plaintiff's transfer from solitary confinement at the more restrictive facility to a "Special Management Unit" at a facility outside of the court's jurisdiction. *Id.* at 1018, 1021-22. The Tenth Circuit ultimately held that the plaintiff's case was constitutionally moot and that the claim was not capable of repetition yet evading review. *See id.* at 1036-37.

The Tenth Circuit opined that, "[w]here a plaintiff requests equitable relief, a mere showing that he maintains a personal stake in the outcome of the controversy is insufficient

. . . . Where a plaintiff seeks an injunction, his susceptibility to continuing injury is of particular importance—past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 1024 (internal quotations and citations omitted). In the specific context of prison transfers, the Tenth Circuit stated: "Where the prisoner's claims for declaratory or injunctive relief relate solely to the conditions of confinement at the penal institution at which the prisoner is no longer incarcerated, courts have concluded that they are unable to provide the prisoner with effective relief." *Id.* at 1027. In the absence of an applicable exception to the mootness doctrine, transfer indicates "the end of the alleged deprivation of [the prisoner's] constitutional rights." *See id.*; *see also id.* at 1028-29 (recognizing that prisoners will often sue the director of the prison system or the system itself in order to invoke exceptions to the mootness doctrine).

In light of this legal precedent, the capable of repetition yet evading review exception to the mootness doctrine does not apply here, and the Court therefore lacks subject matter jurisdiction over Plaintiff's claims to the extent he seeks injunctive relief. Thus, if the Court issued an order granting the relief requested, the order would be an impermissible advisory opinion regarding conditions of confinement at LCJ and would have no "effect in the real world" for Plaintiff. *See id.* at 1029. "[A]s a federal court, [the Court is] not in the business of rendering such feckless judgments." *Deberry*, 460 F. App'x at 799.

In short, Plaintiff's claims for injunctive relief regarding practices and policies at LCJ are moot due to Plaintiff's transfer from LCJ to an independent CDOC facility); thus, the mootness doctrine precludes any injunctive relief that could be imposed against Defendants. *See Jordan*, 654 F.3d at 1026 (stating that, if the plaintiff has not named as

defendants "individuals or entities that are actually situated to have their future conduct toward the plaintiff altered by the court's declaration of rights . . . , courts are likely to determine that they cannot accord the plaintiff effective declaratory relief and that the action is moot").

Accordingly, Plaintiff's claims are **dismissed without prejudice as moot** to the extent they seek injunctive relief.[6]  *See Lewis v. Burger King*, 398 F. App'x 323, 325 n.3 (10th Cir. 2010) (stating that dismissal due to mootness must be without prejudice).

### 3.    Colorado Governmental Immunity Act

Plaintiff vaguely mentions state tort claims in connection with many of his constitutional claims, but he generally does not specify what those state tort claims are. *See Am. Compl.* [#46] at 13, 19, 23, 28, 62, 65, 69 100; *but see id.* at 62 (mentioning "negligence" in connection with his deliberate indifference claim regarding playing handball in sandals), 96 (mentioning "false imprisonment" in connection with his procedural due process claim regarding punitive segregation).  Although Defendants raise this issue in the Motion, Plaintiff's Response does not clarify what tort claims, if any, he is asserting. *Motion* [#144] at 46-48; *Response* [#152-1] at 24.

However, Defendants contend that any state law tort claim, regardless of its nature, must fail because Plaintiff has failed to comply with the notice provisions of the Colorado Governmental Immunity Act ("CGIA").  *Motion* [#144] at 47-48.  Because a public employee's immunity under the CGIA implicates subject matter jurisdiction, the defense

---

[6]  The Court notes that this ruling necessarily also results in the dismissal of Defendant Smith in his official capacity, against whom Plaintiff seeks only injunctive, and potentially declaratory, relief.  *See Response* [#152] at 24-26.

cannot be waived and may be raised at any point in the litigation.  *Glasser v. King*, 721 F.

App'x 766, 770 (10th Cir. 2018); *King v. United States*, 301 F.3d 1270, 1273 (10th Cir.

2002).

Under the CGIA, public employees are generally immune from liability from tort

claims which arise from acts or omissions made within the scope of their employment and

occurring in the performance of their duties.  Colo. Rev. Stat. § 24–10–118(2)(a).  The

CGIA provides two exceptions to this immunity, though: (1) where the act or omission is

willful and wanton, or (2) where the injury "result[s] from the circumstances specified in

[Colo. Rev. Stat. §] 24–10–106(1)."  Colo. Rev. Stat. § 24–10–118(2)(a).

A plaintiff must comply with the mandatory notice requirements of the CGIA:

> Any person claiming to have suffered an injury by a public entity or by an
> employee thereof while in the course of such employment, whether or not by
> a willful and wanton act or omission, shall file a written notice as provided in
> this section within one hundred eighty-two days after the date of the
> discovery of the injury, regardless of whether the person then knew all of the
> elements of a claim or of a cause of action for such injury.  Compliance with
> the provisions of this section shall be a jurisdictional prerequisite to any
> action brought under the provisions of this article, and failure of compliance
> shall forever bar any such action.

Colo. Rev. Stat. § 24–10–109(1).  The notice must be filed with the attorney general when

the claim is against the state or state employees.  Colo. Rev. Stat. § 24–10–109(3)(a).

Plaintiff sent a "Notice of Claims" [#144-9] to the Larimer County Attorney's Office

that was received on November 1, 2017.  However, Plaintiff "admits that his CGIA notice

is futile" and therefore that there is a "jurisdictional defect" as to his state law claims.

*Response* [#152-1] at 24.  Thus, the parties are in agreement on this point.  *See Reply*

[#155] at 30.

However, Plaintiff asserts that his failure to comply with the CGIA is attributable to

Defendants ("the discs that were rendered inoperable, the lack of legal access, the confiscated flash drive"). *Response* [#152-1] at 24.  He states that from "May 2016 to December 2016 and beyond," his asserted lack of adequate access to legal materials meant that he was "ignorant" of the CGIA's requirements. *Am. Compl.* [#46] at 31; *see also id.* at 41 ("I was ignorant of [the CGIA] because of the inadequacy and inaccessibility of the law library . . . .").  He also states that he did not know how to file a notice under the CGIA until he was transferred to CDOC in late 2017 and therefore that his claims were "frustrated/impeded" while he was at LCJ.  *Id.* at 42.

Plaintiff's argument fails.  "Unlike under ordinary statutes of limitations, a plaintiff cannot invoke equitable defenses such as waiver, tolling, or estoppel to overcome" the CGIA's notice provision. *Schreiner v. City of Louisville*, No. 15-cv-00287-REB-CBS, 2015 WL 9437882, at *8 (D. Colo. Dec. 4, 2015), *report and recommendation adopted*, No. 15-cv-00287-REB-CBS, 2015 WL 9315736 (D. Colo. Dec. 23, 2015) (citing *City & Cty. of Denver v. Crandall*, 161 P.3d 627, 633 (Colo. 2007) (en banc)).  "The CGIA notice of claim provision is both a condition precedent and a jurisdictional prerequisite to suit under the CGIA, must be strictly applied, and failure to comply with it is an absolute bar to suit." *Crandall*, 161 P.3d  at 634.  "If a claimant fails to comply, a court must dismiss the matter for lack of subject matter jurisdiction."  *Crandall*, 161 P.3d at 633.  Thus, Plaintiff's arguments regarding actions by Defendants "impeding" or "frustrating" his ability to file under the CGIA are unable to salvage his state tort claims.

Therefore, to the extent Plaintiff raises state law tort claims against Defendants, they are **dismissed without prejudice**. *See Garman v. Campbell Cty. Sch. Dist. No. 1*, 630 F.3d 977, 985 (10th Cir. 2010) (holding that "a dismissal for lack of subject matter

jurisdiction is without prejudice").

**B.      Fed. R. Civ. P. 41(a)(1)(A)(ii): Voluntary Dismissal**

Before reaching the merits of Plaintiff's remaining claims, the Court notes that Plaintiff does not contest dismissal of the following Defendants: (1) Larimer County; (2) Defendant Justin Smith in his individual capacity only; and (3) all Doe Defendants. *Response* [#152] at 24, 26.  Despite the fact that the present Motion [#144] is generally one seeking entry of summary judgment, Defendants do not appear to oppose *dismissal* of all claims against these Defendants.  *See Reply* [#155] at 1-2.

Although the parties agree on dismissal of the above-named Defendants, they provide no legal authority for their agreement.  However, the United States Supreme Court has stated that "[f]ederal courts sometimes will ignore the legal label that a *pro se* litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category." *Castro v. United States*, 540 U.S. 375, 381 (2003).  "They may do so in order to avoid an unnecessary dismissal, to avoid inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Id.* (internal citations omitted).

Pursuant to *Castro v. United States*, the Court finds that the legal basis for Plaintiff's Motion [#28] should be construed under Fed. R. Civ. P. 41(a)(2).  This Rule "governs voluntary dismissals after the opposing party has filed an answer or motion for summary judgment." *Clark v. Tansy*, 13 F.3d 1407, 1411 (10th Cir. 1993).  The Rule provides that such dismissals may be made "only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).  Given the parties' agreement that dismissal is appropriate, and given the late stage of this case and that there is no indication that either

party seeks to have the claims dismissed without prejudice, all claims[7] asserted against

Defendant Larimer County, Defendant Justin Smith in his individual capacity, and the Doe

Defendants are **dismissed with prejudice**.  *See Van Leeuwen v. Bank of Am., N.A.*, 304

F.R.D. 691, 697 (D. Utah 2015) (holding that, while Rule 41(a) does not permit dismissal

of fewer than all claims against any single defendant, Rule 41(a) does permit dismissal of

all claims against one of multiple defendants, which thus permits that defendant to be

dismissed from the case) (distinguishing *Gobbo Farms & Orchards v. Poole Chem. Co.*,

81 F.3d 122, 123 (10th Cir. 1996)).

## C.    Fed. R. Civ. P. 56: Summary Judgment

The Court reiterates that the evidence that Plaintiff offers in opposition to summary

judgment must provide more than conclusory or vague statements in order to create a

genuine issue of material fact with respect to Defendants' evidence.  *See Ford v. West*, 222

F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice to create a

genuine issue of material fact.").    Therefore, the Court may not accept Plaintiff's

"disagreements" with Defendants' supported facts unless Plaintiff directs the Court's

attention to evidence in the record which otherwise supports his "disagreements." *Branson*

*v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that "mere conjecture"

is an insufficient basis for denial of summary judgment).  Finally, the Court also notes that

it disregards all statements consisting of legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).

In addition, the Court must address precisely which aspects of which claims against

---

[7] All claims, that is, except those dismissed without prejudice for lack of subject matter jurisdiction above.

which Defendants are still at issue in this lawsuit.  It is clear that a pro se litigant's pleadings are held "to less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).   This includes at the summary judgment stage of proceedings.  *See Overton v. United States*, 925 F.2d 1282, 1283 (10th Cir. 1991).  The Court must overlook a pro se litigant's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements."  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant."  *Id.*  This means that the Court may not manufacture arguments out of whole cloth for him.  *Acker v. Dinwiddie*, 516 F. App'x 692, 693 (10th Cir. 2013) ("To be sure, it is well-settled that we read a pro se litigant's petition with a special solicitude.  But we are not his advocates, and we cannot create arguments on his behalf out of whole cloth.");  *Tucker v. United States Court of Appeals for the Tenth Circuit*, __ F. App'x __, __, Nos. 20-7003, 20-7004, 2020 WL 2535934, at *1 n.1 (10th Cir. May 19, 2020) (stating that the Court must "stop short of serving as [the pro se litigant's] advocate or crafting arguments on his behalf");  *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[T]his rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.").  In other words, the Court is not obligated to craft arguments and perform the necessary legal research where the pro se litigant's briefs address the opposing arguments only "in a perfunctory manner, unaccompanied by some effort at developed argumentation."  *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) (internal quotation marks omitted).

Here, it is clear that Defendants are seeking dismissal or entry of summary judgment in their favor on all claims asserted by Plaintiff.  *Motion* [#144] at 1.  It is equally clear that

Plaintiff has done an admirable job in developing legal argument and/or record support in opposition to the Motion [#144] with respect to many of his claims. *See generally Response* [#152, #152-1]. However, in this same Response [#152, #152-1], Plaintiff does not address a number of aspects of his claims or occasionally even mention some Defendants seemingly named in connection with those claims.[8]  Thus, while the Court liberally construes Plaintiff's arguments in his Response, the Court finds that Plaintiff has essentially abandoned any claim against any Defendant for which there is not at least "some effort at developed argumentation."[9]  *See Wooten*, 377 F.3d at 1145.  The Court applies this framework to each of Plaintiff's ten remaining claims as specified below.

### 1.    Qualified Immunity

The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity only applies to claims asserting individual capacity liability for civil damages.  *Harlow*, 457 U.S. at 818.  Here, all Defendants who have not been previously dismissed in this Order are sued in their individual capacities only.  *See Am. Compl.* [#46] at 1.

---

[8] Plaintiff's Amended Complaint [#46] does not state which specific Defendants are sued in connection with each specific claim, although Defendants have attempted to infer this information based on whichever names are mentioned in the allegations Plaintiff made under each claim's heading.  *See Motion* [#144] at 2-4.

[9] This is especially true because Plaintiff "does not accept the defendants' recitations of his claims as entirely correct," *see Response* [#152] at 1, and there appears to be no better way to ascertain which claims and Defendants remain at issue than by analyzing which claims and Defendants Plaintiff specifically addresses throughout his Response.

When a defendant raises qualified immunity on summary judgment, the burden shifts to the plaintiff to satisfy a strict two-part test. *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). First, taking the facts in a light most favorable to the plaintiff, the plaintiff must provide evidence demonstrating that each defendant's actions violated a constitutional or statutory right. *Id.* Second, the plaintiff has the burden of showing that "the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Id.* (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir. 1995) (citations omitted)). If the plaintiff does not meet his burden of demonstrating both of these elements, then the defendant is entitled to qualified immunity. *Nelson*, 207 F.3d at 1206.

"Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as he maintains." *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (internal quotation marks and alterations omitted). "However, we do not always require case law on point, and the Supreme Court has warned that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* (internal quotation marks and citations omitted). "We have therefore adopted a sliding scale to determine when law is clearly established." *Id.* "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Id.* at 1135-36. It is not necessary to show that "the very action in question has previously been held unlawful, [but] in the light of pre-existing law the unlawfulness must be apparent." *Id.* at

1136 (internal alterations and quotation marks omitted).

Recently, in *Ali v. Duboise*, 763 F. App'x 645, 649-50 (10th Cir. 2019), the Tenth Circuit Court of Appeals addressed the issue of qualified immunity and "clearly established law."  Affirming the district court's determination that the law was not clearly established (and therefore that the jail official-defendant was entitled to qualified immunity), the Tenth Circuit emphasized that "clearly established law should not be defined at a high level of generality" but must be "particularized to the facts of the case."  *Ali*, 763 F. App'x at 650 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation marks omitted)).  The Tenth Circuit also emphasized that "[a]lthough a plaintiff need not identify a case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate."  *Ali*, 763 F. App'x at 650 (internal quotation marks and ellipsis omitted) (quoting  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

### a.    Claim Six

Plaintiff's Claim Six is based on asserted deliberate indifference by the "supervisory defendants" in failing to protect Plaintiff from sexual misconduct by another inmate.  *See Am. Compl.* [#46] at 52-56; *Response* [#152-1] at 19.   According to the Amended Complaint, the supervisors were Defendants Brown, Burch, Mahoney, Meeks, Wulfert, Villareal, Saults, Berglund, Paloranta, Harteker, Lalicker, and Peranteaux.[10]  However, the only Defendant listed by name by Plaintiff in his Response in connection with Claim Six is Defendant Lalicker, purportedly as the only example of a supervisory Defendant who took any action to protect Plaintiff from the asserted sexual misconduct.  *See* [#152-1] at 19-20.

---

[10]  A "Corporal Simms" is also mentioned here but is not a named Defendant in this lawsuit. *Am. Compl.* [#46] at 52.

Plaintiff explicitly asserts this claim under the Fifth, Eighth, and Fourteenth Amendments. *See Am. Compl.* [#46] at 52.

Plaintiff arrived at LCJ on February 8, 2016, and, at the time of this claim, he was a pretrial detainee because all pertinent events occurred prior to his conviction on July 27, 2017. *Id.* Because Plaintiff was a pretrial detainee, the Eighth Amendment is inapplicable to his claim. *See Porro v. Barnes*, 624 F.3d 1322, 1325-26 (10th Cir. 2010) (stating that the Eighth Amendment applies to "prisoners already convicted of a crime"). Further, the Fifth Amendment governs actions by the federal government and the Fourteenth Amendment governs actions by the states. *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe, New Mexico*, No. 18-1209 KG/JHR, 2020 WL 2198120, at *6 (D.N.M. May 6, 2020) (citing U.S. Const. amends. V; XIV, § 1). Therefore, because there is no indication of any federal action here, the Fifth Amendment is also inapplicable to this claim. Thus, Defendants are entitled to summary judgment in their favor to the extent this claim is asserted under the Fifth and Eighth Amendments.[11] Accordingly, the Court proceeds with its analysis under the Fourteenth Amendment.

In March 2016, inmate Will Williams ("Williams") was placed in the same housing unit as Plaintiff. *Am. Compl.* [#46] at 52. Plaintiff states:

> During [Mr. Williams's] outside the cell rec time he would expose his genitals and anus to the other inmates including me in the pod. He would come to my and other inmates [sic] door and masturbate staring in through the window. While masturbating he would yell and scream disturbing sexual comments

---

[11] To the extent Plaintiff may be asserting a violation of the Fifth Amendment in Claim Nine or any other claim in this lawsuit, the same holding applies. *See Am. Compl.* [#46] at 65. Similarly, to the extent Plaintiff may be asserting a violation of the Eighth Amendment i any other claim, and to the extent the events underlying those claims occurred in full prior to July 27, 2017, this holding also applies.

and our names.  He did this nearly every day he was in the pod with me.

*Id.*  Plaintiff and other inmates reported this behavior to various prison officers who told

them that their supervisors had been informed but had not done anything.  *Id.*  However,

in April 2016, Mr. Williams was moved to another housing unit.  *Id.*

In May 2016, Plaintiff was moved to the same housing unit to which Mr. Williams had

been moved.  *Id.*  "Mr. Williams immediately recommenced his sexual misconduct more

aggressively and less surreptitiously" because this housing unit had less deputy oversight.

*Id.*  "He would masturbate while using the jail information kiosk and while on the phone."

*Id.* at 53.  Plaintiff and other inmates continued to complain to jail deputies and supervisors.

*Id.*  Plaintiff states that "[n]othing was done," but Plaintiff was moved to another housing unit

in June 2016.  *Id.*

On November 4, 2016, Plaintiff was returned to his prior housing unit, where Mr.

Williams was still located.  *Id.*  Mr. Williams "recommenced his sexual misconduct."  *Id.*

Plaintiff states that he "had become one of [Mr. Williams's] favorite victims."  *Id.*  Mr.

Williams "would yell [Plaintiff's] name all night in the pod in a sickening sexual manner."

*Id.*  Plaintiff and other inmates complained to deputies but nothing was done.  *Id.*  On

November 19, 2016, Plaintiff filed a grievance against Mr. Williams.  *Pl.'s Depo.* [#144-2]

at 214.  A couple of days later, Mr. Williams was moved to a different housing unit.  *Am.

Compl.* [#46] at 53.  Defendant Lalicker responded to the grievance shortly after that on

November 25, 2016, telling Plaintiff that a "keep separate" order was put in place to keep

Plaintiff and Mr. Williams from having contact with each other.  *Pl.'s Depo.* [#144-2] at 215-

16.

On March 2, 2017, Plaintiff was moved to the same housing unit as Mr. Williams,

although they lived in separate pods within that unit.  *Pl.'s Undisputed Fact #27* [#152] at 15; *Pl.'s Depo.* [#144-2] at 216-17.  Although these two pods were in the same housing unit, there was no direct access between them unless the inmates from each pod were out in the yard at the same time.  *Pl.'s Depo.* [#144-2] at 217-18.  Plaintiff concedes that he never had direct contact with Mr. Williams in the yard.  *Id.* at 218.  However, although their two pods were separated by a wall, there were also windows built into the wall.  *Am. Compl.* [#46] at 54.  Although separated by the glass, Mr. Williams "still stared at [Plaintiff], exposed himself, blew [Plaintiff] kisses and masturbated."  *Id.*  Plaintiff states that this happened in March and April of 2017.  *Pl.'s Depo.* [#144-2] at 216.

Plaintiff admits that he was unable to find a case demonstrating clearly established law under these circumstances.  *Response* [#152-1] at 19.  However, he points to the Larimer County Sheriff's Office Policy Manual's Prison Rape Elimination Act ("PREA") Procedure, which prohibits sexual misconduct, including the type of behavior allegedly committed by Mr. Williams.  *Pl.'s Ex. T* [#152-21].  Plaintiff also points to several cases for the proposition that "[o]fficers are not immune for conduct that runs contrary to common sense, decency and regulations."  *Response* [#152-1] at 19 (citing *Walters v. W. State Hosp.*, 864 F.2d 695, 699 (10th Cir. 1988) (concerning the right to refuse medication by an individual in protective custody); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (concerning a parolee's right to privacy in his own body); *Howard v. Adkison*, 887 F.2d 134,140 (8th Cir. 1989) (concerning conditions of confinement such as denial of proper cleaning supplies to combat urine and human waste and the denial of proper laundry and barber privileges); *Parker v. Williams*, 862 F.2d 1471, 1477 (11th Cir. 1989), *overruled by Turquitt v. Jefferson County, Alabama*, 137 F.3d 1285 (11th Cir. 1998)

(concerning the alleged rape and kidnapping by a chief jailor of a female inmate released on bond); *Hammond v. Gordon County*, 316 F. Supp. 2d 1262, 1286 (N.D. Ga. 2002) (concerning sexual misconduct between inmates and prison officials)).

While some of these legal authorities may have some persuasive value regarding whether the evidence shows that a constitutional violation occurred here, none involve underlying circumstances similar enough to those asserted by Plaintiff to demonstrate that the law was clearly established at the time of the alleged violations.  To be sure, as a *general* matter, an inmate's right to be free of sexual assault is clearly established.  *Ullery v. Bradley*, 949 F.3d 1282, 1293 (10th Cir. 2020) (citing *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008); *Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)).  However, "the dispositive question is whether the violative nature of the *particular* conduct is clearly established." *Ullery*, 949 F.3d at 1293 (internal quotation marks and brackets omitted) (citing *Mullenix*, 136 S. Ct. at 308).  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ali*, 763 F. App'x at 650.  The Court's own research has discovered no case that meets the "clearly established" requirement, where the issue involved inmate-on-inmate sexual misconduct, where the undisputed evidence is that the plaintiff was never physically touched by the other inmate, and where prison officials took at least some steps to separate the two individuals following complaints.  *See Defs.' Undisputed Fact #28* [#144] at 12 ("Inmate Williams never physically contacted Plaintiff Janny."); *Pl.'s Response* [#152] at 7 (admitting this fact).  Therefore, the Court finds that Defendants Brown, Burch, Mahoney, Meeks, Wulfert, Villareal, Saults, Berglund, Paloranta, Harteker, Lalicker, and Peranteaux are entitled to qualified immunity on Plaintiff's Claim Six.

Accordingly, summary judgment shall enter in favor of Defendants on Claim Six.

### b.    Claim Eight

Plaintiff's Claim Eight is based on asserted deliberate indifference by prison officials to inmate safety in connection with an injury Plaintiff suffered while playing handball. *See Am. Compl.* [#46] at 62-64.  Plaintiff asserts this claim under the United States Constitution, which, although unspecified, the Court construes as stemming from the Fourteenth Amendment based on Plaintiff's status as a pretrial detainee at the relevant time underlying this event. *See id.* at 62.

In May 2016, Plaintiff was in the outside recreation area playing a game called handball, which is permitted by LCJ and which "involves running, sprinting, making quick lateral moves and cuts, stopping abruptly, jumping and diving." *Id.*  While playing, Plaintiff "tripped over the cheap rubber sandals" he was required to wear at all times. *Id.* at 62-63. He "ran head first into the concrete wall at full speed . . . , was knocked unconscious and . . . threw up" when he revived 10-30 seconds later. *Id.* at 62.  Plaintiff states that he has "previously been diagnosed with [traumatic brain injury from] cumulative head trauma" and that "[f]urther head trauma increasingly deteriorates [his] brain and brain function." *Id.* at 63.

Plaintiff acknowledges that he was unable to find a case demonstrating that any purportedly violated constitutional rights here were clearly established. *Response* [#152-1] at 20.  He provides no legal authority in support of whether the claim was clearly established at the time of the violation, and the Court's own research has found no case to place the "constitutional question beyond debate," i.e., a case concerning required inmate footwear during recreational time. *Ali*, 763 F. App'x at 650.  Therefore, Defendants

are entitled to qualified immunity.[12]

Accordingly, summary judgment shall enter in favor of Defendants on Claim Eight.

### c.      Claim One

Plaintiff's Claim One appears to assert Fourteenth Amendment due process claims for being placed on Administrative Segregation ("Ad Seg") status. *Am. Compl.* [#46] at 13-18. The claim solely concerns Plaintiff's placement on Ad Seg status and does not implicate his placement on any other type of status. *See Am. Compl.* [#46] at 13-18. In his Response, Plaintiff provides "some effort at developed argumentation" regarding only two specific incidents, one occurring on February 8, 2016, and one occurring on October 24, 2016 (stated as "September 2016" in the Amended Complaint [#46]). *See* [#152] at 29; *Wooten*, 377 F.3d at 1145. These events appear to involve only Defendants Saults and Villareal, although Plaintiff only mentions Defendant Villareal by name in his Response. *See* [#152] at 29. Thus, to the extent any Defendant other than Defendant Saults or Defendant Villareal is mentioned in this claim[13] or any other basis for this claim *may* have

---

[12]   It is unclear from the Amended Complaint [#46] which Defendants Plaintiff alleges violated his rights in Claim Eight. However, given that all individual Defendants are, with one exception, sued in their individual capacities, all would be entitled to qualified immunity here. The one person sued in his official capacity is Defendant Justin Smith, Larimer County Sheriff. In his Response, Plaintiff contemplates: "Perhaps this claim should proceed against the Larimer County Sheriff in his official capacity for compensatory damages for a policy that caused the injury." *See* [#152-1] at 21. This contemplation, made merely in a brief at this late stage of the case, makes it clear that the claim as asserted in the Amended Complaint [#46] was not asserted against Defendant Smith in his official capacity, especially since he is not mentioned in connection with this claim in the Amended Complaint. However, even if the claim had been properly asserted there and were construed as a *Monell* claim, the Court finds that Plaintiff has failed to demonstrate deliberate indifference given that the undisputed evidence is that Plaintiff voluntarily chose to play handball while knowing the requirement that he must wear his facility-provided footwear, even if that footwear consisted of sandals.

[13]   The Court notes that, in its reading of the Amended Complaint [#46], Defendant Burch also appears connected to the February 2016 events. *See* [#46] at 13. However, Defendants did

originally been made, the Court finds that Plaintiff has abandoned those aspects of this claim in the absence of "some effort at developed argumentation." *See Wooten*, 377 F.3d at 1145. At all times relevant to this claim, Plaintiff was a pretrial detainee. *See Am. Compl.* [#46] at 13-18.

Ad Seg is an inmate status within the LCJ utilized to manage inmates with current or past behavioral issues who pose a threat to the security or safety of the facility, themselves, or others, by housing such inmates separately from other inmates.[14] *Motion* [#144] at 8-9; *Response* [#152] at 4. Ad Seg status has three levels, through which an inmate can progress on a regular seven-day review schedule under certain circumstances.[15] *Motion* [#144] at 10; *Response* [#152] at 5. Per LCJ policy, Plaintiff's Ad Seg status was appropriately reviewed every seven days. *Id.* Ag Seg Level 1 consists of lockdown status and the inmate is kept separate from others, including during meals and time out of his cell. *Defs.' Ex. D, Larimer County Sheriff's Office Policy Manual* [#144-4] at 1. The term "lockdown," when associated with Ad Seg status within the LCJ means that an inmate is confined to his cell for approximately 22.5 hours per day and is released from

---

not read this Claim One as pertaining to Defendant Burch, *see Motion* [#144] at 2, and Plaintiff does not state otherwise in his discussion of this claim in opposition to Defendants' Motion [#144]. *See* [#152] at 27-30. Thus, the Court examines Defendant Burch's actions in connection with this incident solely as they pertain to Claim Two and Plaintiff's placement on Red Tag status in February 2016.

[14] While Plaintiff does not deny this official definition of As Seg, he asserts that it also, or even primarily, is used for punitive purposes. *Response* [#152] at 4.

[15] Plaintiff denies this allegation only to the extent that he disputes what specific circumstances can prevent an inmate from progressing through the three levels. *Response* [#152] at 5.

his cell for approximately ninety minutes for recreation, showering, and other activities.[16]
*Motion* [#144] at 12; *Response* [#152] at 6.   Inmates on Ad Seg Level 2 are kept on
lockdown status but are not kept separate from others.  *Defs.' Ex. D* [#144-4] at 1.  Inmates
on Ad Seg Level 3 are removed from lockdown status as well.[17]  *Id.*

Plaintiff's only evidence regarding Defendant Saults is that, according to jail records,
Defendant Saults put him on Ad Seg status in mid-October 2015 during Plaintiff's previous
brief time at LCJ.  *Am. Compl.* [#46] at 14; *Defs.' Ex. C, LCJ Records* [#144-3] at 1-3.
Plaintiff states that he did not even know he was on Ad Seg status at the time, because no
jail staff informed him of this.  *Am. Compl.* [#46] at 14.  However, the unrebutted evidence
is that Plaintiff was placed on Ad Seg status by Defendant Saults after an incident on
October 14, 2015, described by Defendant Saults in a contemporaneous report as follows:

> I approached Inmate JANNY after he was finished with his meal.  JANNY
> was sitting on the couch in front of the TV's in NA's dayroom.  I asked to
> speak with him in the conference room, and if he could please go get his
> shoes on.  JANNY stood up, dropped his spoon, and took a step towards me.
> I stepped to the side to let him by.  He took another step in my direction.  I
> backed up a step, and he took a third step in my direction.  At this point I put
> my hand up to stop his advance. [Another jail official] called a Code 5 One
> North.  In a loud voice, I told JANNY to turn around and put his hands behind
> his back.  I placed JANNY in handcuffs without any resistance, and [another

---

[16]  In full, disciplinary lockdown is defined by the Larimer County Sheriff's Office Policy
Manual as consisting of: "Confinement to inmate's room and loss of all privileges except: 1. 1 hour
per 24 hours out of the cell for recreation, 15 minutes out for a shower, and 15 minutes provided
to clean the cell with proper supplies.  2. 20 minutes dining time for each meal.  3. Telephone calls
from attorneys or clergy.  All outgoing telephone calls must be made during regular time out.  4.
Visitation. 5. Mail. 6. Adequate food, light, ventilation, temperature control, sanitation, and medical
care.  7. Proper clothing, bed and bedding, use of toilets, sinks, and showers.  8.  Stamps ordered
by commissary order form.  9. Inmate property will not be pulled unless abused or access to the
property threatens security.  10. Access to Mental Health Counselors, Inmate Chaplain and/or
Clergy, or legal materials by submitting an Inmate Request form."  *Defs.' Ex. D* [#144-4] at 18.

[17]  It is unclear whether inmates on Ad Seg Level 3 have any restrictions, as compared to
the general population, or whether this is simply a type of probationary status.

jail official] escorted him to booking.

*Defs.' Ex. C* [#144-3] at 2.

The Court observes that Plaintiff does not provide evidence that Defendant Saults placed him on Ad Seg status when Plaintiff returned to LCJ in February 2016; instead he asserts only that Defendant Saults's action of placing him on Ad Seg status in October 2015 ultimately caused his return to Ad Seg status on February 8, 2016. When Plaintiff was readmitted to LCJ then, he was automatically designated with the status of "Administrative Segregation Level 1" because that was his status when he left the jail in October 2015.[18] *Motion* [#144] at 9; *Response* [#152] at 5.

At his first review period on February 16, 2016, Plaintiff had not received a new sanction or three negative behavior marks, and so was moved to Ad Seg Level 2. *Id.* At his next review period on February 23, 2016, Plaintiff had received four negative behavior marks, and thus he remained at Ad Seg Level 2 instead of progressing to Ad Seg Level 3. *Id.* The next review period on March 1, 2016 found Plaintiff to have no new sanctions or behavior remarks, and he therefore progressed to Ad Seg Level 3. *Id.* Plaintiff's next review period would have been on March 8, 2016, but, before he could be progressed off of Ad Seg entirely, he was returned to Ad Seg Level 1 on March 5, 2016.[19] *Motion* [#144] at 10-11; *Response* [#152] at 5. Between March 5, 2016, and June 20, 2016, Plaintiff

---

[18] While Plaintiff denies Defendants' recitation of this fact, he does so only on the basis of completeness and does not contest that he received these designations on entry to the LCJ. *Response* [#152] at 5.

[19] Plaintiff disputes the reasons for his return to Ad Seg Level 1 but does not dispute that the fact of his status change. *Response* [#152] at 5.

engaged in certain misbehavior and was kept on Ad Seg status.[20]   *Motion* [#144] at 11; *Response* [#152] at 6.  Plaintiff was removed from Ad Seg status entirely on June 20, 2016, having successfully completed progression through the Ad Seg levels with good behavior. *Id.*

Turning to the second incident at issue under Claim One, the evidence is unclear as to precisely what occurred in September or October 2016 between Plaintiff and Defendant Villareal.[21]  Plaintiff states that Defendant Villareal placed him on Ad Seg status, purportedly for refusing a housing assignment.  *Am. Compl.* [#46] at 15.  Plaintiff asserts that, in truth, he had been asked whether he wanted to move to one housing area or to a different housing area "with a higher security status but not just for ad seg or red tags." *Id.* He was not told that if he chose the latter housing option that he would be placed on Ad Seg status.  *Id.*  He received a disciplinary report, waived his hearing, and further received a five-day punitive segregation "lockdown" sanction (which is not at issue in connection with this claim).  *Id.* at 16.  He asserts that he waived his hearing "because demanding a due process hearing would have extended my ad seg placement whether I was eventually found not guilty or guilty." *Id.*  In total, Plaintiff was on Ad Seg status for thirty-five days on this occasion.  *Id.*

Defendants argue that Plaintiff has failed to provide evidence showing that any of the actions purportedly taken by each individual Defendant demonstrates a constitutional

---

[20]  Without specificity, Plaintiff admits that "some" of the misbehavior incidents Defendants cite were true but that "most" were not.  *Response* [#152] at 6.  He does not dispute the fact that he was kept on Ad Seg status during this period, though.  *Id.*

[21]  The parties do not appear to have provided a contemporaneous report in connection with this incident.  *See generally Defs.' Ex. C* [#144-3] at 15-16 (providing no reports between June 23, 2016, and March 2, 2017).

violation, and that each individual's actions do not violate any clearly established right. Pretrial detainees, like Plaintiff, "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Routt v. Howard*, 764 F. App'x 762, 768 (10th Cir. 2019) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). However, pretrial detainees may be subjected "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Routt*, 764 F. App'x at 768 (quoting *Bell*, 441 U.S. at 536-37). Thus, when reaching the merits of this type of claim, the Court "must ask whether an expressed intent to punish on the part of detention facility officials exists. If so, liability may attach. If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction [or condition] in question bears no reasonable relationship to any legitimate governmental objective." *Routt*, 764 F. App'x at 768 (quoting *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013)).

"Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Routt*, 764 F. App'x at 768-69 (quoting *Bell*, 441 U.S. at 540). In other words, "the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Routt*, 764 F. App'x at 769 (quoting *Bell*, 441 U.S. at 540). Relying on Supreme Court precedent, the Tenth Circuit Court of Appeals has cautioned that these decisions "are peculiarly within the province and professional expertise of corrections

officials, and, in the absence of *substantial* evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Routt*, 764 F. App'x at 769 (quoting *Bell*, 441 U.S. at 540 n.23) (emphasis added).

Plaintiff appears to believe that, before any restriction or condition could be imposed on him that was more restrictive than that of the general population at the facility, he was entitled to procedural due process protections. *Response* [#152] at 27-30.  That is simply not the case, however.  Such restrictions and conditions are permitted *unless they amount to punishment*.  In other words, mere restrictions and conditions, such as loss of privileges, are permitted to be imposed for virtually any reason connected to effective prison management unless they rise to the level of constitutional punishment. *See Blackmon*, 734 F.3d at 1241 ("Where exactly do we draw the line between what does and doesn't constitute "punishment"?  Historically, the government has enjoyed the authority to detain until trial those defendants who pose a flight risk.  And no doubt those who find themselves detained in this manner experience a great many restrictions on their liberty—restrictions many of us would regard as punishment in themselves.  But when do these restrictions pass, as a matter of law, from constitutionally acceptable to constitutionally impermissible?").

The Court here makes no finding regarding whether the evidence is sufficient to support the finding of a constitutional violation under the first prong of the qualified immunity analysis because Defendants Saults and Villareal are entitled to qualified immunity under the second prong of the analysis.  In order to show that Plaintiff's clearly established constitutional rights were violated in connection with his Ad Seg status, he must point to a

case where the conditions and restrictions he endured under that status have been held to "amount to punishment."  Plaintiff has pointed to no evidence of an "express intent" to punish him but appears to focus on a lack of any reasonable relationship to a legitimate government objective.  *See Response* [#152] at 27-30.  Therefore, because the applicable case law "allows prohibitions and restrictions that are reasonably related to legitimate penological interests," Plaintiff "must include sufficient facts" showing "that the actions of which he complains were *not* reasonably related to legitimate penological interests."  *See Gee v. Pacheco*, 627 F.3d 1178, 1187-88 (10th Cir. 2010).

Several examples illustrate this point.  In *Blackmon v. Sutton*, 734, F.3d at 1242, the Tenth Circuit Court of Appeals held that an eleven-year-old pretrial detainee who was sometimes shackled to a restraint chair for long periods even when there was not any hint that he posed a threat to himself or anyone else, or long after any such threat had dissipated, did not serve any legitimate penological purpose and therefore was impermissible punishment under the Fourteenth Amendment.  In *Littlefield v. Deland*, 641 F.2d 729, 730, 732 (10th Cir. 1981), for fifty-six-days a pretrial detainee was placed in a solitary "strip cell" with no windows, no interior lights, no bunk, no floor covering, and no toilet except for a hole in the concrete floor which was flushed irregularly from outside the cell.  The detainee was deprived of all clothing and bedding, reading or writing materials, and any articles of personal hygiene.  *Littlefield*, 641 F.2d at 730.  The Tenth Circuit held that holding "a pretrial detainee under conditions of detention this extreme for such an excessive period as fifty-six days is punishment and, absent a determination of guilt, cannot be imposed in accordance with the due process clause of the fourteenth amendment."  *Id.* at 732.  In *Colbruno v. Kessler*, 928 F.3d 1155, 1164 (10th Cir. 2019), the Tenth Circuit

held that walking an adult pretrial detainee naked through a hospital, where there was not a medical need so pressing that a few minutes could not be spared to find replacement clothing, constituted punishment under the Fourteenth Amendment with no legitimate penological purpose.

On the other side of the scale are those cases where discipline has not been deemed to rise to the level of punishment and/or was deemed to be connected to a legitimate penological purpose.  For example, in *Routt v. Howard*, 764 F. App'x at 769, the Tenth Circuit held that a 72-hour lockdown of pretrial detainees after a sharpened toothbrush was found in a communal shower was not punishment where the alleged actions "support[ed] a reasonable, non-exaggerated response to [the Jail's] legitimate interest in maintaining security and order."  In the same case, the Tenth Circuit held that an officer on the night shift yelling in the cells, loudly pounding on glass with keys, and otherwise making it hard to sleep did not constitute punishment where there was no evidence of long-term exposure to the noisy nighttime conditions.  *Routt*, 764 F. App'x at 769-70.  In *Cox v. Denning*, 652 F. App'x 687, 691-92 (10th Cir. 2016), the Tenth Circuit Court held that, while discomforting, a nighttime-recreation policy for pretrial detainees, forcing the plaintiff-inmate to take his recreation time around midnight, did not constitute punishment because it was designed to permit close monitoring of inmates who might pose a danger to themselves or others.  In *Peoples v. CCA Detention Centers*, 422 F.3d 1090, 1106-07 (10th Cir. 2005), a pretrial detainee was placed in segregation on his arrival at the detention center and kept there for about thirteen months, but the Tenth Circuit held that this did not constitute punishment "due to his plot to escape from his previous pretrial detention facility" and the facility's legitimate interest in segregating him because he was

an escape risk.

Finally, the Court notes that the Tenth Circuit has acknowledged that there is a "distinction between punitive and administrative segregation, although, "[a]dmittedly, it is an unclear and murky line that separates these two types of segregation." *Frazier v. Dubois*, 922 F.2d 560, 563 (10th Cir. 1990) ("We have some difficulty in drawing a line between punitive and non-punitive segregation because most segregation would seem to involve both elements."). Regardless, it *is* clear that merely enduring "segregation" without a due process hearing is, *standing alone*, insufficient to meet the requirements of this claim.

Plaintiff has directed the Court to no case, and the Court has found none through its own research, where restrictions and conditions similar to those of LCJ's Ad Seg status were deemed to rise to the level of punishment or where such restrictions and conditions were deemed to bear no reasonable relationship to any legitimate governmental objective. *See, e.g.*, *Colbruno*, 928 F.3d at 1164 (separately determining (1) whether the defendants' conduct rose to the level of punishment, and therefore of a Fourteenth Amendment violation, before determining (2) whether the conduct was rationally related to a legitimate governmental objective or was excessive in relation to that purpose). That is especially true in circumstances such as these where there is no evidence that Defendant Saults made the decision on February 8, 2016, to keep Plaintiff on Ad Seg status on his return to LCJ and where Plaintiff made the decision to waive his hearing, for whatever personal reason, in connection with his September/October 2016 placement on Ad Seg status by Defendant Villareal. Thus, even if the Court were to find that the evidence is sufficient to demonstrate the violation of a constitutional right, Defendants Saults and Villareal are still entitled to qualified immunity on this claim in the absence of clearly established law

forbidding their conduct.

Accordingly, summary judgment is entered in favor of Defendants on Claim One.

### d.   Claim Two

Claim Two is similar to Claim One except that Plaintiff's "Red Tag" status is at issue rather than his "Ad Seg" status. *Am. Compl.* [#46] at 19-22. At all times relevant to this claim, Plaintiff was a pretrial detainee. *See id.* This Fourteenth Amendment claim is asserted against Defendants Saults and Burch. *See id.*

"Red Tag" is a security status applied to inmates who pose a physical threat to LCJ staff or other inmates.[22] *Motion* [#144] at 9; *Response* [#152] at 4-5. The precise contours of the restrictions imposed on an inmate under Red Tag status are not clearly delineated in the evidence. However, Plaintiff testified that it is "pretty much just . . . [a] [d]ifferent form[ ] of administrative segregation." *Pl.'s Depo.* [#144-2] at 40-41. He stated that "[r]ed tag status can't order canteen . . . [and] is subject to the same lockdowns as . . . the people on administrative segregation level 3." *Id.* at 41. The main difference, Plaintiff testified, is that there must be sufficient staff members present for a Reg Tag inmate to be permitted outside of his cell in the common areas. *Id.* at 41-42. For example, a 2:1 Red Tag status means that there must be two deputies present for that inmate to be outside of his cell, and if two inmates with 2:1 Red Tag status are out of their cells at the same time, there must be four deputies present. *Id.* The same concept applies to 1:1 Red Tag status, where there must be one deputy present for that inmate to be outside of his cell, and if two inmates with 1:1 Red Tag status are out of their cells at the same time, there must be two

---

[22] While Plaintiff does not deny this official definition of Red Tag status, he asserts that it is also, or even primarily, used for punitive purposes. *Response* [#152] at 4-5.

deputies present.  *Id.*

The only evidence regarding Defendant Saults is identical to that recited above in connection with Claim One and Plaintiff's placement on "Ad Seg" status, except that this claim involves Plaintiff's placement on "Red Tag" status at the same time.  *Am. Compl.* [#152] at 20.  The only evidence regarding Defendant Burch is that he put Plaintiff on Red Tag status when Plaintiff returned to LCJ on February 8, 2016, purportedly because Plaintiff had been on Red Tag status when he'd previously left LCJ in October 2015 and because Plaintiff had made threats to staff during his booking.  *Am. Compl.* [#46] at 19; *Motion* [#144] at 9; *Response* [#152] at 5.[23]  Plaintiff states that he was on Red Tag status from February 8, 2016, until sometime in July 2016, for a total of about 160 days.  *Am. Compl.* [#46] at 21.  Per LCJ policy, Plaintiff's Red Tag status was reviewed every thirty days. *Motion* [#144] at 10; *Response* [#152] at 5.

Resolution of this claim is materially identical to resolution of Plaintiff's claim regarding Ad Seg status.  Plaintiff has directed the Court to no case, and the Court has found none through its own research, where restrictions and conditions similar to those of Red Tag status, as used by LCJ, were deemed to rise to the level of punishment or where those restrictions and conditions were deemed to bear no reasonable relationship to any legitimate governmental objective, such as facility security.  Specifically as to Defendant Burch, the Court has found no case showing that Plaintiff's clearly established rights were violated because, on Plaintiff's return to LCJ, he was placed on the same status he had been under when he had previously left the same facility.  Thus, even if the Court were to

---

[23] While Plaintiff denies that the reasons he was put on Red Tag status are true, he does not contest that he received these designation upon entry to the LCJ.  *Response* [#152] at 5.

find that the evidence is sufficient to demonstrate the violation of a constitutional right, Defendants Saults and Burch are still entitled to qualified immunity on this claim in the absence of clearly established law.

Accordingly, summary judgment is entered in favor of Defendants on Claim Two.

### e.   Claim Eleven

Claim Eleven is similar to Claim One and Claim Two except that Plaintiff's "punitive segregation" status (which appears to be used interchangeably with "disciplinary segregation") is at issue rather than his "Ad Seg" status or his "Red Tag" status.  *Am. Compl.* [#46] at 96-99.  At all times relevant to this claim, Plaintiff was a pretrial detainee with Fourteenth Amendment protections.  *See Am. Compl.* [#46] at 96.  Based on their reading of the Amended Complaint [#46], Defendants believe that Defendants Gee and Paloranta are the named Defendants under this claim.  *Motion* [#144] at 4.  Plaintiff does not explicitly contest this, but the only Defendant he names, or even appears to allude to, in his Response is Defendant Palmer.  *See* [#152] at 31.

The precise factual basis for this claim also appears to be a bit of a "moving target," even though Plaintiff attempts to clarify the basis for this claim in his Response [#152].  First, he states that he "has not challenged the punitive segregation/disciplinary lockdown that resulted from [his] waiv[er]" of hearings which he appears to concede were appropriately offered.  *Response* [#152] at 33.  Second, and similarly, he states that he "has not challenged the consequences of waiving those hearings which only apply to punitive segregation/disciplinary lockdown."  *Id.*  Third, he states that what he is challenging is "the policy/custom/act that when an inmate requests a hearing [in connection with punitive segregation] . . . they are held back from progressing to the next stage of ad seg

-42-

whether they are found guilty or not . . . for the reason that they requested a hearing." *Id.* However, elsewhere he appears to state that he is also contesting that class A violations under the Policy Manual can result in disciplinary lockdown in the absence of any due process procedural protections. *Id.* at 31.

As was the case with Red Tag status, the precise restrictions imposed on an inmate under punitive segregation are not clearly delineated by the parties.  However, Plaintiff testified that there was no difference in the time permitted out of one's cell (ninety minutes per day) regardless of whether an inmate was on Ad Seg 1 or punitive segregation 1.  *Pl.'s Depo.* [#144-2] at 49-50.  As mentioned above, this time is permitted for the inmate to do such things as care for his hygiene (including taking a shower) and clean his cell.  *Id.* at 114.  All of the "basic essentials" like food and water are also provided regardless of status. *Id.*

The evidence regarding Defendant Gee is as follows.  On March 2, 2017, Defendant Gee wrote up Plaintiff for four rule violations consisting of two class A write ups (one for making unnecessary noise and one for transfer of property) and two class B violations (one for disrespecting staff and one for possessing contraband).  *Am. Compl.* [#46] at 96. Plaintiff asserts that he was sent to the punitive segregation pod because Defendant Gee had given him two consecutive 48-hour lockdowns for the class A write ups, and Plaintiff was purportedly not permitted an adversarial hearing for those write-ups.  *Id.* at 96-97. Plaintiff asserts that Defendant Gee was mistaken regarding both of the class A violations. *Id.* at 97.  Regardless, the Court notes that there is no evidence that Defendant Gee herself made the decision not to permit Plaintiff an adversarial hearing in connection with the punitive segregation he received.  In fact, the only evidence is that Defendant Palmer was

the person who made the decision to forego hearings in connection with punishment imposed for class A violations, although inmates were permitted to use the grievance system to contest this punishment. *See Defs.' Response to Pl.'s First Set of Discovery Requests to Defendants (Second Set of Admissions, Third Set of Interrogatories), Interrogatory #22* [#152-3] at 27 ("As the Commander of the Larimer County Jail [Defendant Palmer] made the decision to revise the policy to permit for the more efficient handling of disciplinary matters. Minor rule violations could be grieved by an inmate to the supervisor on duty who could review and revise the sanction. Major rule violations are appealed through professional standards. This ensures that the inmates were afforded due process in the most timely and efficient way possible while permitting the jail to maintain control over the facility.").

Plaintiff's official lockdown for the class A violations ended on March 6, 2017, but because he was listed as "pending sanction" as a result of his request for a due process hearing on the underlying events, Defendant Paloranta decided that Plaintiff had to remain in punitive segregation until the hearing. *Id.* Defendant Paloranta told Plaintiff that the jail's policy is that time spent waiting for a disciplinary hearing does not count as time served toward an eventual sanction, and therefore Plaintiff believes that his initial time spent in segregation was "for nothing." *Id.* A short time later, on April 14, 2017, Defendant Paloranta placed Plaintiff on Ad Seg status. *Id.* at 98. Although unclear, it seems that Plaintiff was still subject at this time to disciplinary/punitive segregation in addition to the Ad Seg status. *Id.* at 98. Regardless, Plaintiff feels he was "coerced to waiving" his hearing on this issue because he would be on segregation longer if he demanded a hearing than if he did not. *Id.* at 98-99.

Thus, Plaintiff appears to be complaining of two separate issues: (1) the lack of due process before being punished in connection with the undefined "class A" violations, and (2) the fact that an inmate is not permitted to progress through the three Ad Seg levels while awaiting resolution of due process hearings in connection with punitive segregation and other non-class A types of violations. *Response* [#152] at 30-33; *Response* [#152-1] at 1.

However, Plaintiff has directed the Court to no case, and the Court has found none through its own research, where (1) requiring an inmate to remain on Ad Seg status pending a due process hearing, (2) not counting the time spent waiting in segregation toward an eventual sanction, or (3) substituting a grievance process in place of a full hearing for minor violations, has been deemed violative of a clearly established right. Thus, even if the Court were to find that the evidence is sufficient to demonstrate the violation of a constitutional right, Defendants Gee, Paloranta, and Palmer are still entitled to qualified immunity on this claim in the absence of clearly established law.

Accordingly, summary judgment is entered in favor of Defendants on Claim Eleven.

### f.    Claim Three

Plaintiff appears to assert three legal bases in connection with this claim: (1) Fourteenth Amendment due process, (2) Fourteenth Amendment equal protection, and (3) First Amendment. The Court addresses each in turn. Defendants Belinder, Berglund, and Palmer appear to be named in connection with this claim, although none are mentioned by name or specifically alluded to in Plaintiff's Response. *See* [#152-1] at 1-6.

Plaintiff states that because he had ADC and not a public defender, his calls to his attorney were not free while he was housed at LCJ. *Am. Compl.* [#46] at 24. Plaintiff

states he grieved the issue with the solution of making ADC lawyer phone numbers free to call. *Id.* at 25.  Defendant Belinder told Plaintiff that "the solution would be no lawyer calls would be free anymore and that the public defenders office would be taken off the free phone list." *Id.*  Plaintiff states that Defendant Belinder "acknowledge[d] the way things stood was unfair and unequal" but that "his solution at least would have made things equal for all indigent inmates." *Id.*

Defendant Belinder's solution was never enacted, and so Plaintiff appealed to Defendant Palmer on April 9, 2017. *Id.*  On May 2, 2017, Defendant Palmer told Plaintiff that "the solution was already in place that no inmate can use the recorded inmate phone system to place free calls to their attorney," and that "if inmates were calling their lawyers for free that mistake had been corrected." *Id.*  The next day, Plaintiff wrote another inmate request to Defendant Palmer, although it was "intercepted" by Defendant Berglund. *Id.*  The request stated that "inmates were still able to call the public defenders office for free," because Plaintiff had successfully done so while he was still charged for calling his ADC counsel. *Id.*  On May 22, 2017, Defendant Berglund responded telling Plaintiff to submit the grievance on the proper form. *Id.*  The next day, Plaintiff did so, submitting a grievance to Defendant Palmer, stating that he had untruthfully been told that the issue had been fixed regarding some inmates getting free calls to their lawyers while others could not do so. *Id.*  Defendant Palmer responded: "This matter is over.  You have no more appeals in this matter." *Id.*  Plaintiff asserts that both Defendant Palmer and Defendant Belinder lied to him "about correcting the situation and ignored all subsequent attempt[s] to get them to follow through with what they had said." *Id.*

The main thrusts of Plaintiff's claim here appear to be as follows.  First, all inmates

-46-

were not treated equally because those with public defenders could call their attorneys for free while those with ADC counsel could not.  Second, Plaintiff's right to access the courts, through access to his attorney, was violated when he did not have the funds to place calls to his attorney.  Third, and least clearly, Plaintiff seems to assert a due process claim in connection with his efforts to get LCJ to either allow free inmate calls to ADC counsel or eliminate free inmate calls to public defenders.

Regardless of whether this claim is construed under the Fourteenth Amendment's due process clause, the Fourteenth Amendment's equal protection clause, the First Amendment, or all three, Plaintiff has presented no legal authority demonstrating that any of the actions taken by any of these three Defendants violated any of Plaintiff's rights that were clearly established at the time.  Likewise, the Court has found no case finding a clearly established right for an inmate to call his counsel for free.[24]  The Court has found no case holding that the law is clearly established that all inmates must be able to contact their counsel for free or else all inmates must be required to pay to contact their counsel. The Court has found no case holding that the law is clearly established in connection with LCJ's grievance process utilized by Plaintiff regarding the free-calls issue.  In the absence of such clearly established rights, the Court finds that Defendants Belinder, Berglund, and Palmer are entitled to qualified immunity on this issue.

---

[24]    The Court notes that there is no indication that Plaintiff was prevented from all communication with his counsel, such as communication by mail or when Plaintiff's counsel called the jail instead.  In fact, courts have found much greater restrictions may not rise to the level of a constitutional violation.  *See, e.g.*, *Hardesty v. Saline County Jail*, No. 19-3211-SAC, 2020 WL 1547823, at *1-3 (D. Kan. Apr. 1, 2020) (holding that the plaintiff failed to adequately allege that the jail staff prevented his access to the courts or caused him an actual injury even where the plaintiff alleged that he was not allowed to call his attorney, that he was denied visitation rights, that he could only contact his attorney by mail, and that he was charged for paper and envelopes).

Accordingly, summary judgment shall enter in favor of Defendants on Claim Three.

> **g.    Claim Four**

In his Response, Plaintiff frames this claim solely as a "*Bounds* right to assistance claim," referring to *Bounds v. Smith*, 430 U.S. 817 (1977), a case which merely acknowledged "the (already well-established) right of access to the courts." *Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *see* [#152-1] at 6.  Thus, Plaintiff appears to have abandoned all aspects of this claim except those asserted under the First Amendment. *See Wooten*, 377 F.3d at 1145.  It is difficult to determine *which* Defendants are named in this claim, because Plaintiff does not explicitly identify them in his Amended Complaint [#46] and because Plaintiff does mention *any* specific Defendant in connection with this claim in his Response [#152-1] at 6-8.  However, all things considered, the Court construes the claim as being asserted against Defendants Saults, Palmer, Ramirez, Berglund, Paloranta, Mahoney, Villareal, and Lalicker, all of whom are mentioned at some point in connection with this claim.  *Am. Compl.* [#46] at 28-43.

In February or March 2016, when the mobile legal kiosk was in Plaintiff's housing unit, Defendant Saults told Plaintiff that, unless he was proceeding as a pro se litigant in his lawsuits, he was only permitted to use the kiosk during his recreation time, meaning that Plaintiff could not use the kiosk for more than an hour per day and that he must choose between legal research and using the kiosk.  *Am. Compl.* [#46] at 29-30.  Plaintiff was not a pro se litigant at this time, but he "wanted to assist in [his] criminal defense and research any legal action" he could take.  *Id.* at 29.

In August 2016, Defendant Saults and Defendant Ramirez decided that Plaintiff could request supervisor approval to be given extra time to use the legal kiosk.  *Id.* at 33.

In July, August, and September 2016, most deputies would not permit additional legal access time because the supervisors did not tell them of this "new rule."[25]  *Id.* at 34. Specifically, Defendants Paloranta and Mahoney would not permit Plaintiff any extra time even when he had fulfilled his obligation to use all his allowed free time on legal work.  *Id.* Although his allegations are less than clear, Plaintiff also states that he was told by Defendant Villareal on an unspecified date that, because he was pro se, he would have priority to use the jail's conference room for unspecified reasons (although apparently for his legal work), but Plaintiff was never actually permitted to use the conference room when any other "professional" needed the room.  *Id.*

On September 29, 2016,[26] Plaintiff was placed in punitive segregation, and Defendant Ramirez said that if Plaintiff used all of the time out of his cell not meant for cleaning and hygiene for legal research, he would be permitted more time.  *Id.* at 34.  From September 29 to November 22, 2016, Plaintiff states that he had almost no exercise time outside of his cell because he was forced to choose between his two rights, stating that he had "definitely less than 5 hours a week [and] closer to 0-3 hours a week" of exercise.  *Id.* at 34-35.

Finally, Plaintiff asserts that, from March 29, 2017, to September 20, 2017, Defendants Palmer, Ramirez, and Berglund placed Plaintiff in "de facto segregation" to stop him from filing grievances and, therefore, from exhausting his administrative remedies,

---

[25]  The Court notes the partial contradiction here, in that Plaintiff asserts that he was not permitted extra time in July 2016 pursuant to a "new rule" that was not in place until sometime in August 2016.

[26]  Plaintiff's statements here refer to "2017," but this appears to be a clear misstatement given that there is no dispute that Plaintiff was removed from the LCJ to a different facility on September 20, 2017.

thereby preventing Plaintiff from accessing the courts. *Am. Compl.* [#46] at 32.

In *Lewis v. Casey*, 518 U.S. at 350-51, the United States Supreme Court held that the right of access to the courts was not a right guaranteeing access to a law library or to legal assistance, but rather was the right to "the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." In other words, the right of access to the courts "guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Lewis*, 518 U.S. at 356.

From March 29, 2017, to September 20, 2017, Defendants Palmer, Ramirez, and Berglund's placement of Plaintiff in "de facto segregation" stopped him from filing grievances and, therefore, from exhausting his administrative remedies, thereby preventing Plaintiff from accessing the courts. *Am. Compl.* [#46] at 32. However, Plaintiff has provided no evidence of any specific injury or impact this "de facto segregation" had on any particular lawsuit, which is fatal to his legal assistance claim. *See, e.g.*, *Simkins*, 406 F.3d at 1243-44 (recognizing a sufficient showing of actual injury where prisoner demonstrated specific impact on prosecution of a particular case). To raise a claim for denial of access to the court, Plaintiff must show that failure to apply the proper standard of care in reviewing his grievances and permitting access to legal materials "resulted in 'actual injury' by 'frustrating,' or 'hindering his efforts to pursue a nonfrivolous legal claim.'" *Simkins v. Bruce*, 406 F.3d 1239, 1243 (10th Cir. 2005) (quoting *Lewis*, 518 U.S. at 351-53 (internal brackets omitted)). Conclusory allegations of injury will not suffice. *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999).

The Court has found no case demonstrating that any actions similar to those taken

by these Defendants violated a plaintiff's clearly established rights.  For example, the Court has found no case acknowledging a clearly established constitutional right in connection with an access-to-the-courts claim regarding (1) an inmate's right not to have to choose between recreation time and legal research time, (2) an inmate's right to have "extra time" approved for legal research if he fully uses his otherwise allotted legal research time, or (3) an inmate's right to have priority use of a jail facility's conference room.  Plaintiff argues that many cases demonstrate his clearly established rights in this area, but the Court finds that none are specific enough or comparable enough to the facts of this case to apply here. *Response* [#152-1] at 6-8 (citing *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1053 (8th Cir. 1989) (stating that one hour twice a week is inadequate time to research most legal claims); *Cruz v. Hauck*, 627 F.2d 710, 720 (5th Cir. 1980) (noting "some reservations" about whether 2-3 hours per week is adequate time); *Tillery v. Owens*, 719 F. Supp. 1256, 1283 (W.D. Pa. 1984) (requiring a minimum of four hours per week of law library time per inmate who wanted it), *aff'd*, 907 F.2d 458 (3rd Cir. 1990); *Ramos v. Lamm*, 485 F. Supp. 122, 166 (D. Colo. 1979) (holding that three hours of library time every four-to-six weeks is insufficient), *aff'd in part and rev'd in part*, 639 F.2d 559 (10th Cir. 1980); *Davis v. Milwaukee County*, 225 F. Supp. 2d 967, 967-77 (E.D. Wisc. 2002) (holding that having no legal materials available to detainees is insufficient to meet constitutional requirements). Thus, Defendants Saults, Palmer, Ramirez, Berglund, Paloranta, Mahoney, Villareal, and Lalicker are entitled to qualified immunity on this claim.

Accordingly, summary judgment shall enter in favor of Defendants on Claim Four.

### h.    Claim Nine

Claim Nine concerns "confiscation/destruction of legal papers" and is an

"interference claim." *Response* [#152-1] at 8.  The Amended Complaint mentions the First, Fourth, Fifth, and Fourteenth Amendments and could liberally be read as being asserted against multiple Defendants. *Am. Compl.* [#46] at 65-67.  However, Plaintiff here develops argument only with respect to the First Amendment and Defendants Paloranta and Wulfert and a September 2016 incident. *Response* [#152-1] at 8-9.  The Court therefore finds that Plaintiff has abandoned all other aspects of Claim Nine. *See Wooten*, 377 F.3d at 1145.

While Plaintiff was in punitive segregation in September 2016, Defendants Paloranta and Wulfert searched his possessions and confiscated several folders of legal materials which included purportedly exculpatory letters from Plaintiff's co-defendants in the criminal suit pending against them. *Id.* at 65-66.  These items were never returned to him. *Id.* at 66.  Plaintiff states he was found guilty at trial on July 27, 2017, of two counts of aggravated robbery and one count of theft, but he states that the only evidence against him was a recorded conversation from one of his co-defendants that could have been explained away by the lost letters. *Id.*

Defendants argue that this claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), which holds that a claim for damages under § 1983 cannot be maintained if granting such relief "would necessarily imply the invalidity of [a prisoner's] conviction or sentence" and the prisoner has not demonstrated "that the conviction or sentence has already been invalidated." *Heck*, 512 U.S. at 487.

Regarding the first *Heck* element, whether granting such relief would necessarily imply the invalidity of Plaintiff's conviction or sentence, the Court finds that it does.  Plaintiff explicitly states that "the only inculpatory evidence against me was [his co-defendant's] recorded conversation with an agent of the police that could have been explained" by the

exculpatory letter his co-defendant wrote, which purportedly "apologized for telling other inmates [Plaintiff] was involved and explained it was because he thought if he told a different version of the story every time he could never get in trouble for it" and further "went into detail about the lies he told during one such conversation that another inmate recorded during a police operation," so that Plaintiff could prove that his co-defendant had been lying during the recorded conversation. *Am. Compl.* [#46] at 65-66.  In his Response, Plaintiff asserts that his "actual injury" here "is the deprivation of exculpatory letters that are essential to a post-conviction proceeding." *Response* [#152-1] at 9.

This case is similar to *Harper v. Woodward County Board of County Commissioners*, No. CIV-11-996-HE, 2016 WL 4487701, at *6 (W.D. Okla. May 17, 2016), where the inmate-plaintiff asserted that the prison official-defendant's disposal of exculpatory evidence had deprived him of his right of access to the courts.  The plaintiff stated that the destruction of evidence prevented him from being able to defend against the criminal charges brought against him.  *Harper*, 2016 WL 4487701, at *6.  The court held that the plaintiff's claim was barred by *Heck* because the requested relief "would necessarily imply the invalidity of [a prisoner's] conviction or sentence." *Id.*; *Heck*, 512 U.S. at 487.  The issue here is the same: Plaintiff argues that he was denied access to the courts because exculpatory evidence was destroyed.

As for the second element of *Heck*, there is no evidence that Plaintiff's conviction or sentence has already been invalidated.  *Heck*, 512 U.S. at 487.  In fact, insofar as the Court can discern from the briefs, Plaintiff's criminal appeal is ongoing.  The fact that Plaintiff tries to frame this issue as concerning post-conviction proceedings rather than the conviction itself is of no moment here.  *See, e.g.*, *Maynard v. Casebolt*, 221 F.3d 1352

(Table), 2000 WL 1005265, at *3 (10th Cir. Jul. 20, 2000) (holding that a prisoner's claim that the defendants conspired to deprive him of records and transcripts necessary to appeal his conviction necessarily implies the invalidity of the conviction; "[b]ecause [the prisoner's] conviction has not yet been invalidated, this claim is not cognizable under § 1983 and was properly dismissed under *Heck*"). Thus, because both requirements are met for *Heck* to apply, Defendants are entitled to qualified immunity on this claim.

Accordingly, summary judgment shall enter in favor of Defendants on Claim Nine.

### i.   Claim Ten

The precise legal basis for Plaintiff's Claim Ten is unclear, but in the Amended Complaint he asserts a "campaign of harassment/retaliation for protected conduct" under the United States Constitution. *See* [#46] at 69. Plaintiff here develops argument only with respect to the First Amendment and Defendants Wulfert, Ramirez, Palmer, Gee, and Berglund. *Response* [#152-1] at 10-16. The Court therefore finds that Plaintiff has abandoned any other aspects of Claim Ten. *See Wooten*, 377 F.3d at 1145.

Plaintiff may prove retaliation by showing the following: "(1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007). In connection with the third element, Plaintiff must show that "but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *Turner v. Falk*, 632 F. App'x 457, 460 (10th Cir. 2015).

In his Response, Plaintiff breaks down this claim into two purported acts of retaliation. *See* [#152-1] at 10-16.  First, Plaintiff argues that Defendant Gee impermissibly retaliated against him for helping other inmates with their legal work by confiscating Plaintiff's legal work and bringing disciplinary charges against him. *Id.* at 1012.  On March 2, 2017, Defendant Gee wrote up Plaintiff for having legal notes and documents he was in the process of creating for another inmate. *Am. Compl.* [#46] at 71.  Plaintiff states the documents were solely originals which he was creating for the other inmate's civil rights-related litigation, but that technically the documents still belonged to Plaintiff and were kept in Plaintiff's folder labeled with a parody of the other inmate's name. *Pl.'s Ex. G* [#152-8] at 11.  The disciplinary report states that Defendant Gee and another jail official were searching Plaintiff's belongings when they "uncovered that he had excess laundry, excess books, three pairs of reading glasses, and [another inmate's] legal paperwork," which violated the Inmate Handbook's prohibitions on contraband and the transfer of property such as legal paperwork. *Defs.' Ex. C* [#144-3] at 16.  The report further states that Plaintiff "is well aware of the rules concerning contraband and transferring property.  He will be sanctioned." *Id.*  Plaintiff's Jail – Inmate Discipline record indicates that Plaintiff was written up for (1) making unnecessary noise, (2) profanity/derogatory remarks or gestures, (3) having or attempting to obtain contraband, and (4) buying, selling, or transfer of property. *Defs.' Ex. H* [#144-8] at 4-5.  Plaintiff states he was put in segregation as a result of the legal work he was creating for the other inmate. *Am. Compl.* [#46] at 71.

Plaintiff asserts that he has a constitutional right to help other inmates with their legal work. *Response* [#152-1] at 10-12.  This is incorrect.  "A retaliation claim does not arise . . . when the underlying activity is the plaintiff's legal assistance to other inmates, because

a prisoner 'does not have a protected interest in providing legal representation to other inmates.'" *Baughman v. Saffle*, 24 F. App'x 845, 849 (10th Cir. 2001) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)).   "As *Baughman* [*v. Saffle*] makes clear, because helping other inmates is not a constitutionally-protected activity, a prison officer can permissibly take adverse actions against the inmate because of such conduct." *Peoples v. Baker*, No. 17-cv-00776-MSK-NYW, 2019 WL 1200834, at *6 (D. Colo. Mar. 13, 2019); *see also Shepard v. Rangel*, No. 12-cv-01108-RM-KLM, 2014 WL 7366662, at *20 (D. Colo. Dec. 24, 2014) ("However Plaintiff attempts to spin this argument, the facts pled in Plaintiff's Amended Complaint indicate that this 'association' took the form of legal assistance.   Even if the alleged retaliation arose from Plaintiff's association, the Court declines to find that a retaliation claim is viable when the underlying activity is an inmate's legal assistance to other inmates.").   In a case similar to this one, the Tenth Circuit Court of Appeals held: "While [the plaintiff's] complaint suggests that he was placed in segregation in retaliation for his advocacy efforts on behalf of other inmates, this Court has made clear that an inmate does not have a protected interest in providing legal representation to other inmates." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).[27]

Plaintiff provides a list of cases, almost all out-of-circuit, which he contends shows

---

[27] There may be some very limited exceptions to this rule, none of which have been argued here or appear to be supported by the evidence.  *See Smith*, 899 F.2d at 950 (requiring a showing that "other inmates were deprived of access to the courts, or unduly hindered in the pursuit of their own legal remedies").  Plaintiff does say that the inmate he was helping, though "not illiterate," was "almost completely ignorant of the law" and had been denied use of the jail's law kiosk, but this alone is a far cry from being totally deprived of access to the courts or being *unduly* hindered in the pursuit of his legal remedies.  *Am. Compl.* [#46] at 72-73.

that the right to help other inmates with their legal work is a clearly established right. *Response* [#152-]1 at 11.   Even if he is correct (about which the Court makes no comment), the law of the Tenth Circuit is binding on this Court's decisions and must be followed rather than any persuasive authority from any other circuit.   The only Tenth Circuit case Plaintiff cites is *Frazier v. Dubois*, 922 F.2d at 561-62, which held that an inmate may not be transferred between prison facilities based solely on retaliation for the exercise of his First Amendment rights.   That case, alone, does not demonstrate that Plaintiff's retaliation claim based on helping another inmate is a constitutionally protected right. Therefore, Defendant Gee is entitled to qualified immunity.

The Court next turns to the purportedly retaliatory act(s) asserted by Plaintiff in connection with Defendants Wulfert, Ramirez, Palmer, and Berglund.   *Response* [#152-1] at 10-16.   This claim stems from events originating in late March 2017, a few weeks after the events described in connection with Defendant Gee.   *See id.* at 12.   On March 18, 2017, Plaintiff wrote an inmate kite "offering to help inmates with basic legal issues/research."   *Am. Compl.* [#46] at 72.   On March 22, 2017, he received a response from a non-party jail official telling him that "being a jailhouse lawyer" was not in his "best interest."   *Id.* at 73.   On March 29, 2017, Plaintiff received two responses to his step one grievances concerning LCJ's Ad Seg, Red Tag, and punitive segregation policies.   *Id.*   The responses were written by Defendant Ramirez, which Plaintiff characterizes as "extraordinary" because he was typically the responder for step four grievances.   *Id.*; *Response* [#152-]1 at 12.   Very shortly afterward on the same day, Plaintiff was transferred to the WCB housing pod area "that has been used for segregation almost exclusively since the housing area has been open."   *Am. Compl.* [#46] at 73.   At the time of his transfer to

WCB, Plaintiff was the only inmate in that housing pod, although that lasted for only about a week. *Pl.'s Ex. B* [#152-3] at 11; *Pl.'s Ex. G* [#152-8] at 5. However, Mr. Williams was located in WCA, a separate pod in the same housing area, from which he could be seen and heard by Plaintiff, despite the physical barriers between pods, and Mr. Williams "again exhibited the same types of behaviors toward" Plaintiff. *Id.* at 73-74; *Response* [#152-1] at 12; *Pl.'s Ex. G* [#152-8] at 3. Plaintiff believes this violated the keep separate order that was in place. *Am. Compl.* [#46] at 74. However, despite the fact that Plaintiff could see and hear inmates in this adjoining pod, he complains that his placement in WCB was intended to make him "the most segregated isolated inmate in LCJ" because he was the only inmate in WCB at the time. *Response* [#152-1] at 13; *Pl.'s Ex. B* [#152-3] at 11.[28]

Although the Court liberally construes Plaintiff's Response as continuing to assert this claim against Defendants Wulfert, Palmer, Berglund, and Ramirez, the evidence provided demonstrates that only Defendant Ramirez and/or Defendant Palmer took any action, retaliatory or not, with respect to this aspect of Plaintiff's claim. *See* [#152-1] at 12-16. In his Response, Plaintiff makes only the following statements about Defendants Wulfert and Berglund. First, without citation to evidence, Plaintiff states: "Defendant Wulfert say[s] the plaintiff was placed there [in WCB] for giving legal advice." *Id.* at 15. Second, Plaintiff states: "Defendant Berglund told [a fellow inmate] that he could not be placed in WCB because it was used as special housing to segregate inmates." *Id.* (citing *Pl.'s Ex. M2* [#152-14]). Neither of these statements show that either of these Defendants made the decision to place Plaintiff in WCB or otherwise took purportedly retaliatory actions against

---

[28] Plaintiff also cites to his Exhibit O [#152-16] here, but this document, which involves an October 1, 2015 incident, appears to have nothing to do with the events underlying this claim.

him.  Therefore, Defendants Wulfert and Berglund are entitled to qualified immunity on this claim.

The evidence regarding Defendants Ramirez and Palmer is somewhat intertwined, thus the Court addresses it collectively.  In his Response, Plaintiff does not direct the Court's attention to evidence that Defendant Palmer took the purportedly retaliatory action. In fact, Plaintiff's only mention of Defendant Palmer is an unsupported statement that "[t]he reason Defendant Palmer says the defendant [sic] was put into WCB is a recitation of why an inmate would be put in administrative segregation."  [#152-1] at 14.  However, in a statement provided during discovery, Defendant Ramirez states: "[Defendant] Palmer directed me to have Plaintiff Janny moved to the West Charlie area."  *Pl.'s Ex. B* [#152-3] at 34.  In connection with this incident, Defendant Palmer states, without saying that he made the decision: "Inmate Janny had a history of being quite disruptive in the facility.  To reduce disruption of the facility while still allowing inmate Janny the ability to attend programming, inmate Janny was moved into a pod with a small population."  *Id.* at 33. Defendant Ramirez further states:

> I understood this move to be predicated on Plaintiff Janny was filing [sic] multiple grievances that were keeping staff from supervising the area appropriately and he was abusing the grievance procedure.  Plaintiff Janny was convincing other inmates in the areas that he was housed to file unsubstantiated grievances which were intended to overburden the staff when the multiple inmates would argue with staff.  Plaintiff Janny was creating an environment that was not a safe work environment, [and] inmates in the area were becoming confrontational.
>
> Plaintiff Janny was grieving that he was not getting enough time with the pro-se computer, in the areas he was housed, to work on his criminal case and making references that his access to the courts was being blocked because of his limited access.  Due to the large number of inmates in the areas where he was housed and competing with these inmates for the limited resources in the area, Plaintiff Janny was moved to a smaller housing area, in order to

facilitate more time for Plaintiff Janny to work on the pro-se computer without impeding his court access.

*Id.* at 34.

In his Response, Plaintiff states the following about Defendant Ramirez: (1) "On 3/29/17 the plaintiff received two step one grievance responses from Defendant Ramirez, a step four grievance responder which in itself is extraordinary, [and] within a half hour the plaintiff was transferred to WCB." *Response* [#152-1] at 12 (without citation to evidence). (2) Defendant Ramirez "documented in jail reports the placement was not for filing grievances but swore under oath in his interrogatories [that] the plaintiff's placement in WCB was for filing grievances." *Id.* at 13 (without citation to evidence but apparently referring to Plaintiff's Exhibit B [#152-3] at 34, cited in relevant part above). (3) "Defendant Ramirez admits [that Plaintiff] was placed in WCB because of the plaintiff filing grievances (in his interrogatory response not the jail behavior reports where he denies the same)." *Response* [#152-1] at 15 (again, without citation to evidence but apparently referring to Plaintiff's Exhibit B [#152-3] at 34, cited in relevant part above).  It is unclear which "jail behavior reports" Plaintiff is referring to here, but he may be referring to a report dated March 31, 2017, in which Defendant Ramirez stated:

> Inmate Mark Janny will be housed in the West Charlie Bravo pod on general population/rotational lockdown status.  Inmate Janny will remain on general population status with full access to programs, commissary and other privileges afforded to general population inmates. I spoke with inmate Janny and informed him of his housing area and Inmate Janny was concerned that he was placed on Administrative Segregation status for his current sanction. I informed him that he has not been placed on administrative segregation and he will be housed in a general population housing area, currently West Charlie Bravo, as long as he is behavioral appropriate.

*Defs.' Ex. C* [#144-3] at 23.

-60-

Regarding the second element of a retaliation claim, the Court notes that simply being transferred to a less desirable housing unit, without more, is insufficient to demonstrate an "adverse action." *See, e.g.*, *Hunnicutt v. DeSantiago*, __ F. Supp. 3d __, __, No. CIV 18-0889 JB/JFR, at *8 (D.N.M. Sept. 26, 2019). However, for purposes of this discussion, the Court assumes, without so holding, that the specific circumstances presented, including transfer to a housing unit that was typically used for administrative segregation, being the only inmate in that housing unit for a week, and being subjected to Mr. Williams's taunts from the adjoining housing pod, do constitute adverse actions sufficient to meet the second element of a retaliation claim.

Turning to the third element, Plaintiff must show that his filing of grievances was the "but-for" cause of his placement in WCB. *See Turner*, 632 F. App'x at 460. Defendants argue that Plaintiff has failed to produce evidence that, "but for the retaliatory motive," Plaintiff would not have been moved to WCB. *See id.* At the outset, the Court notes that the evidence recited above is circumstantial regarding whether Defendant Ramirez made the decision to place Plaintiff in WCB; the only direct evidence, from Defendant Ramirez, is that Defendant Palmer made the decision.

The Court agrees with Plaintiff to the extent that there is an issue of fact regarding whether Plaintiff's filing of grievances played a role in his transfer to WCB. Indeed, Defendant Ramirez explicitly admits that the filings were part of the reason the transfer was made: "I understood this move to be predicated on Plaintiff Janny was filing [sic] multiple grievances . . . ." *Pl.'s Ex. B* [#152-3] at 34. Further, generally, the LCJ policy to keep an inmate from abusing the grievance process is simply to limit him to one grievance per 30 days for up to 60 days if, after a written warning, the inmate continues to abuse the

grievance process. *Response* [#152] at 17; *Reply* [#155] at 12.

However, even if Plaintiff's filing of grievances was part of the reason for his move to WCB, Defendants have provided unrebutted evidence that this was not the "but for" reason that Plaintiff was moved to a different housing unit. Plaintiff must provide some evidence that creates a genuine issue of material fact by undermining or otherwise bringing into doubt Defendants' alternative justifications. *See, e.g.*, *Mata v. Douglas*, No. 2:15-cv-00575, 2018 WL 4688347, at *8-9 (D. Utah Sept. 28, 2018) (discussing the plaintiff's failure to provide evidence undermining the defendants' non-retaliatory justifications for a search of the plaintiff's cell and the issuance of a drug charge: "[t]he search was routine, his cell was randomly chosen, and a suspicious substance was found"). Without such evidence, Plaintiff's belief that his transfer to WCB was retaliatory becomes "conjectural and conclusory" and is insufficient "to create a genuine issue of fact concerning [a] First Amendment retaliation claim." *Strope v. Cummings*, 381 F. App'x 878, 883 (10th Cir. 2010); *Banks v. Katzenmeyer*, 645 F. App'x 770, 774 (10th Cir. 2016).

Defendants provide three alternative justifications for moving Plaintiff to WCB. First, Defendant Ramirez states: "I understood this move to be predicated on Plaintiff Janny was filing [sic] multiple grievances that were keeping staff from supervising the area appropriately and he was abusing the grievance procedure." *Pl.'s Ex. B* [#152-3] at 34. Abuse of the grievance process alone is a permissible non-retaliatory reason for taking adverse action against an inmate. For example, in *Ayers v. Uphoff*, 1 F. App'x 851, 855 (10th Cir. 2001), an inmate-plaintiff asserted that the prison official-defendants violated his First Amendment rights by retaliating against him for filing prisoner grievances. The Tenth Circuit noted that "the record reveals that, despite numerous warnings from prison officials,

plaintiff continually abused the prison's grievance procedures by filing multiple and overlapping grievances and by making excessive demands on the prison's staff." *Ayers*, 1 F. App'x at 856.  The Tenth Circuit held: "Given this unopposed evidence, we believe that the limitations placed on plaintiff's use of the prison's grievance procedures were justified and reasonable under the circumstances and did not amount to a violation of plaintiff's First Amendment rights." *Id.*  Here, the record is not clear on the precise number of grievances filed by Plaintiff up to this point, i.e., late March 2017.  However, it is clear that Plaintiff submitted roughly 200-300 grievances and appeals between February 8, 2016, and September 20, 2017, the span of time he spent at LCJ, a substantial number of which had been filed by late March 2017.  *Depo. of Pl.* [#144-2] at 141-43.  Plaintiff does not direct the Court's attention to evidence undermining this justification for Defendants' action.

Second, Defendant Ramirez states that "Plaintiff Janny was convincing other inmates in the areas that he was housed to file unsubstantiated grievances which were intended to overburden the staff when the multiple inmates would argue with staff." *Pl.'s Ex. B* [#152-3] at 34.  He further states: "Plaintiff Janny was creating an environment that was not a safe work environment, [and] inmates in the area were becoming confrontational." *Id.*  Plaintiff does not direct the Court's attention to evidence undermining this justification for Defendants' action either.  *See, e.g.*, *Evans v. Schnurr*, No. 18-3193-JWB, 2020 WL 1547818, at *5-6 (D. Kan. Apr. 1, 2020) (holding that the "but-for" element was not met where the defendant provided unrebutted evidence that the plaintiff was moved to different housing because he was "a security risk to the female staff working" in his original housing area).

Third, Defendants state that the move was predicated, at least in part, "in order to

facilitate more time for Plaintiff Janny to work on the pro-se computer without impeding his

court access," in response to Plaintiff's grievances on this issue.  *Pl.'s Ex. B* [#152-3] at 34.

Again, Plaintiff does not direct the Court's attention to evidence undermining this

justification for Defendants' action.  *See, e.g.*, *Ellis v. Bryant*, No. CIV-18-1092-D, 2019 WL

5460697, *6-7 (W.D. Okla. Oct. 7, 2019) (holding that the "but-for" element was not met

where the defendant provided unrebutted evidence that the purportedly retaliatory act of

confiscating plaintiff's property was at least in partial response to resolving a bedbug

infestation issue raised by the plaintiff himself to prison officials).

In short, Plaintiff must explain why the complained-of acts "were not ordinary,

legitimate prison practices," *Reed v. Heimgartner*, 579 F. App'x 624, 627 (10th Cir. 2014),

and "evidence of temporal proximity is insufficient to establish a retaliatory motive when

independent evidence demonstrates a non-retaliatory motive." *Smith v. Abalos*, No. 16-cv-

00188-CMA-NRN, 2019 WL 926919, at *4-5 (D. Colo. Feb. 26, 2019) (citing *Dawson v.

Audet*, 636 F. App'x 753, 758 (10th Cir. 2016)).  In fact, this case is similar to *Ortiz v.

Torgensen*, No. 2:17-CV-328 TC, 2019 WL 1376837, at *9-10 (D. Utah Mar. 27, 2019),

where the court stated:

> Plaintiff did argue time correlation and he has produced undisputed facts that
> Defendants . . . stated that his propensity to file grievances was a reason for
> moving him.  Still, Defendants' explanations for their actions carry the day.
> Plaintiff has not shown that strictly "but for" a retaliatory motive Defendants
> would not have moved him to more restrictive housing with its consequent
> loss of privileges and property confiscation.  He may even have shown that
> retaliation for filing grievances played a role in moving Plaintiff to more
> restrictive housing but he failed to show that such retaliation was the decisive
> factor.

(internal quotation marks omitted) (citing *Banks*, 645 F. App'x at 772; *Strope*, 382 F. App'x

at 710).  As a result, the Court finds that the third element of a retaliation claim is not met,

and Defendant Ramirez and Defendant Palmer are entitled to qualified immunity.[29]  *See McBeth v. Himes*, 598 F.3d 708, 719 (10th Cir. 2010) ("If there is a finding that retaliation was not the but-for cause of the adverse action, the claim fails for lack of causal connection . . . despite proof of some retaliatory animus in the official's mind.") (alterations and quotation marks removed).

Accordingly, summary judgment shall enter in favor of Defendants on Claim Ten.

### j.    Claim Twelve

The precise legal basis for Plaintiff's Claim Twelve is unclear, but, in the Amended Complaint [#46], Plaintiff generally points to "retaliation, harassment, false imprisonment, malicious prosecution, procedural due process violation, and frustrated/hindered legal claims."  *See Am. Compl.* [#46] at 100.  While Defendants move for entry of summary judgment in their favor on this claim in full, Plaintiff's Response develops argument solely with respect to First Amendment retaliation and Defendants Ramirez and Smoyer.  *See* [#152-1] at 16-18.  Thus, the Court finds that Plaintiff has abandoned all other aspects of Claim Twelve.  *See Wooten*, 377 F.3d at 1145.

On or close to November 14, 2016, Defendant Ramirez and other jail officials told Plaintiff that he "was able to use anything [he] could access" on the new pro se computer because it would only allow access to what inmates were permitted to access.  *Pl.'s Ex. G* [#152-8] at 7.  On August 18, 2017, several jail officials searched Plaintiff's cell for his flash

---

[29]  In addition, the Court notes that, while Plaintiff has a clearly established right not to be subjected to retaliation solely because of his use of the grievance system, the Court has found no case showing a clearly established right when taking into account the unrebutted facts underlying this claim and taking all other facts in a light most favorable to Plaintiff.  Thus, Defendants are entitled to qualified immunity on the clearly established prong of the analysis as well.

drive on which he had been saving pictures he had taken with this jail computer.  *Am. Compl.* [#46] at 100.  Two deputies not named in this lawsuit confiscated the flash drive, which also included some of Plaintiff's legal documents.  *Pl.'s Ex. G* [#152-8] at 9.

On August 30, 2017, Plaintiff purportedly "used the jail's legal mail system to mail the complaint in this case to get [his] flash drive back."  *Pl.'s Ex. G* [#152-8] at 9.  On August 31, 2017, Defendant Ramirez met with Plaintiff, telling him he would have the flash drive inspected, destroy any files that Plaintiff was not permitted to have, print anything else Plaintiff needed printed off of it, allow him to send the flash drive home, and allow Plaintiff to obtain a second, different flash drive for his future work.  *Am. Compl.* [#46] at 103-04.  Defendant Ramirez also told Plaintiff that he would be receiving a ten-day sanction for abusing the pro se inmate computer on August 18, 2017, despite the fact that LCJ's disciplinary procedures " do not allow for rule violations to be brought outside of 7 business day(s) after the incident," according to Plaintiff.  *Pl.'s Ex. G* [#152-8] at 9.

On September 5, 2017, Plaintiff spoke with Defendant Smoyer about the charges brought against him, including the procedural seven-business-days issue.  *Id.* at 10.  Defendant Smoyer immediately went to a computer to follow-up on Plaintiff's complaint, and the next day when Plaintiff had his hearing, the dates on the disciplinary report had been changed.  *Id.*  In support of this statement, Plaintiff points to copies of the Jail Incident - Hearing Report for Incident Number 170003055 as evidence that the reports were falsified.  *Am. Compl.* [#152] at 22.  A copy printed on August 31, 2017, lists the Incident Date/Time as August 18, 2017.  *See Pl.'s Ex. R* [#152-19] at 1.  On a copy printed September 6, 2017, the Incident Date/Time was amended to August 31, 2017.  *Id.* at 2.  Defendants admit that the dates are different but "deny any inference that they were

intentionally altered for any unlawful purpose." *Reply* [#155] at 13.  Plaintiff was found guilty at the disciplinary hearing and, in total, was not permitted to leave his housing pod for seventeen days.  *Am. Compl.* [#46] at 104-05.

"Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."  *Smith*, 899 F.2d at 947 (describing a prison official's retaliation after inmate had filed grievances against the prison official). "It is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under . . . Section 1983 even if the act, when taken for a different reason, would have been proper."  *Id.* at 948.  However, the plaintiff must show "*specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Peterson*, 149 F.3d at 1144 (internal quotation marks omitted) (emphasis in original).

Plaintiff asserts that "[c]onspiratorial planned disciplinary actions violate the 1st Amendment and are clearly established violations."  *Response* [#152-1] at 18 (citing *Milhouse v. Carson*, 652 F.2d 371, 373 (3d Cir. 1981) ("We read appellant's complaint as alleging that he was subjected to a conspiratorially planned series of disciplinary actions as retaliation for initiating a civil rights suit against prison officials.  Such allegations, if proven at trial, would establish an infringement of [appellant's] first amendment right of access to the courts."); *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003) ("The law of this circuit is clearly established . . . that a prison official may not retaliate against . . . an inmate . . . for complaining to a supervisor about a guard's misconduct.  [The plaintiff] established a 'chronology of events' showing retaliatory motive on the part of defendant . . . , as the disciplinary charge filed by [defendant] was accompanied by [the plaintiff's] 'letter of resolution' in which he accused [defendant] of misconduct and lying.").

First, the Court notes that there is no evidence of any conspiracy between Defendants Ramirez and Smoyer regarding any action, beyond Plaintiff's speculative statement, which is clearly insufficient. *See Bones*, 366 F.3d at 875 (stating that conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence). Second, even if Defendant Smoyer impermissibly changed the date on the disciplinary report, there is no direct or even circumstantial evidence that he knew that Plaintiff was planning to file or had actually filed his lawsuit the day before. *See, e.g.*, *Pfeil v. Lampert*, 11 F. Supp. 3d 1099, 1118-19 (D. Wyo. 2014) ("Moreover, [the prison official] was unaware of any lawsuit filed by Plaintiff at the time he was placed in his job [, i.e., the asserted adverse action]. There simply is no evidence to support that Plaintiff was retaliated in his job placement as a result of this lawsuit." (internal citation omitted)). Without such evidence, the Court cannot find that Defendant Smoyer's actions were taken in response to the filing of the lawsuit. *See Friedman v. Kennard*, 248 F. App'x 918, 922 (10th Cir. 2007) ("Standing alone and without supporting factual allegations, temporal proximity between an alleged exercise of one's right of access to the courts and some form of jailhouse discipline does not constitute sufficient circumstantial proof of retaliatory motive to state a claim.").

Thus, the Court turns to the claim as it concerns Defendant Ramirez. Regarding the first element, i.e., whether the plaintiff was engaged in constitutionally protected activity, the answer is clearly yes, because filing a lawsuit is a constitutionally protected activity. *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007); *see also Handy v. Douglas*, No. 14-cv-01930-WYD-MEH, 2016 WL 11383923, at *8 (D. Colo. Jan. 5, 2016) (holding that a demonstrated intent to file is also sufficient to meet this element).

Regarding the second element, Plaintiff must show that Defendant Ramirez's actions would chill an ordinary person from continuing to file lawsuits. *Shero*, 510 F.3d at 1203. "[A]lthough certainly not dispositive, persistence in speech is some evidence that the defendant's actions would not prevent such speech." *Washington v. Martinez*, No. 19-cv-00221-MEH, 2020 WL 209863, at *6 (D. Colo. Jan. 14, 2020) (citing *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("[The plaintiff's] persistence in maintaining his website offers some evidence that [the defendant's] actions did not prevent such private speech."); *How v. City of Baxter*, 217 F. App'x 787, 798 (10th Cir. 2007) (holding that the defendant was entitled to qualified immunity on the plaintiff's First Amendment retaliation claim, in part, because the plaintiff "continued to exercise his First Amendment rights thereafter . . .")). There is ample evidence that Plaintiff heavily grieved and litigated various issues and lawsuits throughout his time at LCJ. However, the purportedly retaliatory action here occurred on August 31, 2017, and Plaintiff was transferred from LCJ on September 20, 2017. The parties have not directed the Court's attention to any lawsuits, or even any grievances, that were filed by Plaintiff between August 31, 2017, and September 20, 2017, although there is some evidence that Plaintiff spent significant time using the legal kiosk on September 6, 14, and 15. *Defs.' Ex. C* [#144-3] at 43-44. However, in the absence of any other evidence on this point, the Court finds that this, standing alone, provides no more than a scintilla of evidence to support the conclusion that the disciplinary action taken against Plaintiff would not dissuade a person of ordinary firmness from continuing to engage in the protected conduct of filing lawsuits. *See, e.g.*, *Penrod v. Zavaras*, 94 F.3d 1399, 1404 (10th Cir. 1996) (finding retaliation when prison officials transferred the inmate to administrative segregation and threatened him with further retaliation if he continued

complaining).

Along with the uncontested disciplinary action resulting in Plaintiff's segregation, Defendant Ramirez also told Plaintiff that "any file the jail does not want [Plaintiff] to have will be destroyed" and that Plaintiff would "not be present during this screening and tampering nor [would] any lawyer of [Plaintiff's]." *Am. Compl.* [#46] at 102-03. "Retaliation for exercising that right that includes the destruction of legal papers and being wrongfully placed in segregation would 'chill' a person of ordinary firmness from continuing to file lawsuits." *Wilson v. Johnson*, No. 19-cv-02279-CMA-NRN, 2020 WL 1875148, at *9 (D. Colo. Apr. 15, 2020) (citing *Banks v. Katzenmeyer*, 645 F. App'x 770, 773 (10th Cir. 2016) ("The allegation of multiple 'fabricated' write-ups within a short period of time presents a sufficient allegation of injury to satisfy the 'chill' test."). Thus, the Court finds that the second element of a retaliation claim is met.

The third element requires evidence showing that Defendant Ramirez's adverse action was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct. *Shero*, 510 F.3d at 1203. Plaintiff must show that "but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." *Turner*, 632 F. App'x at 460.

Here, the evidence is that Plaintiff's flash drive with all his legal materials on it, including a draft copy of his complaint for this lawsuit, was confiscated on August 18, 2017. *Am. Compl.* [#46] at 100. He was told by the two non-party jail officials who confiscated it that he was "not in any kind of disciplinary trouble" and that he "had done nothing wrong." *Id.* Partially as an attempt to get his flash drive back, Plaintiff mailed his complaint in this lawsuit on August 30, 2017. *Id.* at 102. Plaintiff states that, during his August 31, 2017

conversation with Defendant Ramirez, "[m]ost of the things he told me addressed what I had alleged (facts helping my case such as no disciplinary action being taken) or asked for in the complaint I had submitted the previous night." *Id.* at 103.  Plaintiff then states that Defendant Ramirez "smirked and told me he would answer none of my questions and if I wanted anything to get it through litigation." *Id.*  Thus, there is some evidence, when seen in a light most favorable to Plaintiff as the nonmovant, that Defendant Ramirez knew that Plaintiff had filed a lawsuit and what the substance of that lawsuit concerned.

Further, the evidence shows, during that same meeting, Defendant Ramirez told Plaintiff that he would be written up and given a sanction, despite the fact that Plaintiff had been told (albeit by two other jail officials) two weeks earlier that he would not be sanctioned because he had done nothing wrong, and despite the fact that, under the jail's own policy, the time had expired to take disciplinary action against Plaintiff: the flash drive was confiscated on August 18, 2017, and seven business days later was August 29, 2017.[30]  *Am. Compl.* [#46] at 100; *Defs.' Ex. D, Policy Manual* [#144-4] at 23 (stating that the Disciplinary Hearing Board  "resolve[s] cases of major and serious rule violations, and . . . hear[s] inmates' appeals of minor violation hearing decisions"), 24 ("The hearing must

---

[30] There appears to be an issue of fact here not adequately addressed by the parties as to when, under the Policy Manual, the seven-day limitation to bring disciplinary action against Plaintiff began.  On the one hand, when taken in a light most favorable to Plaintiff as the Court must, the clock began to run the day that the flash drive was confiscated, August 18, 2017.  On the other hand, it seems clear that having the flash drive *alone* was not against the rules, and so the clock may have begun running on the unidentified date when the flash drive was reviewed by jail officials and any purported violation in its contents was discovered, which may have been much later.  In fact, there is at least a scintilla of evidence that the flash drive had not yet been reviewed at the time of the meeting between Defendant Ramirez and Plaintiff at about 2:00 p.m. on August 31, 2017.  *See Am. Compl.* [#46] at 102-03 (stating that Defendant Ramirez told Plaintiff that "he *will* have my flash drive inspected and that any file the jail does not want me to have will be destroyed" and that Plaintiff "*will* not be present during this screening" (emphases added)).

be scheduled as soon as practicable but no later than 7 days, **excluding** weekends and county holidays, after the alleged violation.  If the hearing is postponed or continued for a reasonable period and for good cause, it must be documented in writing.").  In other words, given that the time to bring disciplinary action against Plaintiff regarding the flash drive had apparently expired, a reasonable jury could find that the only reason Plaintiff was disciplined was because of the exercise of his constitutional right of access to the courts.[31]

In addition, as noted above, a temporal proximity between a plaintiff's protected action and a jail official's disciplinary action is, standing alone, insufficient to meet this element, but a temporal proximity must usually be present in conjunction with the other evidence, especially when the claim is based on circumstantial evidence of retaliation. *See Friedman*, 248 F. App'x at 922.  Here, however, that is easily met, given that Plaintiff's asserted action took place on August 30 and the asserted retaliatory action took place on August 31.  *See, e.g.*, *Gee*, 627 F.3d at 1189 (holding that the "but for" requirement was satisfied where the inmate's complaint alleged that the defendants were aware of his protected activity, that the inmate complained of their actions, and the retaliatory action was in close temporal proximity to the protected activity).

Thus, in short, the Court finds that Plaintiff has done more than assert his "personal belief that he is a victim of retaliation."  *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999).  The evidence, when seen in a light most favorable to Plaintiff as the nonmovant, shows that Defendant Ramirez knew that Plaintiff had filed a lawsuit against the jail and then took disciplinary action against him based on an "expired" violation of jail rules.

---

[31]  The Court notes that there appears to be no evidence that written notice of continuance of the hearing was ever provided to Plaintiff.

Finally, the Court finds that Plaintiff's rights here were clearly established.  "The constitutional right to be free from retaliation for the exercise of first amendment rights [is] clearly established.  It is well settled that prisoners cannot be retaliated against when they exercise their First Amendment rights."  *Allen v. Avance*, 491 F. App'x 1, 6-7 (10th Cir. 2012)  (citing *Smith*, 899 F.2d at 947-48; *Gee*, 627 F.3d at 1189 ("It is well-settled that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."); *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) ("[I]f in fact DOC officials retaliated against [the plaintiff] based on his filing administrative grievances, they may be liable for a violation of his constitutional rights."); *Peterson*, 149 F.3d at 1144 ("We have held that prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights."); *Penrod*, 94 F.3d at 1404-05 ("[I]t is well established that prison officials . . . may not harass or retaliate against an inmate for exercising his right . . . to petition the Government for redress of . . . grievances.")).

Accordingly, summary judgment is entered in favor of Defendants on Claim Twelve *except* for Defendant Ramirez.  The Motion [#144] is **denied** with respect to Claim Twelve to the extent it is asserted against Defendant Ramirez.

## IV.  Conclusion

For the foregoing reasons,

IT IS HEREBY **ORDERED** that the Motion [#144] is **DENIED in part and GRANTED in part**.  The Motion is **denied** with respect to Claim Twelve to the extent it is asserted against Defendant Ramirez in his individual capacity for monetary damages.  The Motion

is **granted** to the extent that the following claims are **dismissed without prejudice**: (1) all claims to the extent they seek declaratory relief, (2) all claims to the extent they seek injunctive relief, (3) all claims asserted against Defendant Smith in his official capacity, and (4) all claims asserted under state law.  The Motion is further **granted** to the extent that the following claims are **dismissed with prejudice**: (1) all claims asserted against the Doe Defendants, (2) all claims asserted against Defendant Smith in his individual capacity, and (3) all claims asserted against the Municipality of Larimer County.  The Motion is further **granted** to the extent that summary judgment shall enter in favor of Defendants on all other claims not previously mentioned in this paragraph.

Dated:  May 29, 2020

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge